# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

EQUAL EMPLOYMENT OPPORTUNITY            )
COMMISSION,                             )
                                        )
                        Plaintiff,      )    CIVIL ACTION NO. 1:20-cv-00521
                                        )
            v.                          )
                                        )
OTOKUMPU STAINLESS USA, LLC             )
                                        )
                                        )
                                        )
                        DEFENDANT       )

---

## PLAINTIFF UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO OUTOKUMPU'S MOTION FOR SUMMARY JUDGMENT

---

i

# TABLE OF CONTENTS

I. Introduction……………………………………………………………………………...1

II. Statement of Facts………………………………………………………………….…...2

    A.    Burress Has Experience in Hazardous Jobs and a Flawless Safety Record …..……...2

    B.    Burress's Anxiety Diagnosis and Use of Xanax………………………………….....3

    C.    OTK Recruited and Conditionally Offered Burress a Job……………………..….…4

    D.    Burress Underwent Pre-Employment Examinations at OHC ………………….…....5

    E.    OTK Ignored Burress's Attempts to Discuss His Disqualification ……………..…..8

    F.    OTK Never Considered Reinstating Burress's Offer…………………………….…..9

    G.    "Safety Sensitive" Is Not an Essential Job Function…………………………….…10

    H.    OHC and OTK Cannot Prove Buress Posed an Actual Threat…………………….…11

        1.    OTK Has No Medical, Scientific or Even Anecdotal Evidence
              Xanax Has Caused Safety Incidents…..…………………………….….12

        2.    OTK Did Not "Individually Assess" Any Risk Posed by Burress
              Per Its Policy……………………………………………………....……12

        3.    OHC Disqualified Burress Based on Assumption and Incomplete
              Information, Not Medical Facts……………………………………….…13

    I.    Dr. Swotinsky's Opinion and Testimony are Unrefuted by Any Expert and Establishes
        Material Questions of Fact…………………………………………………….....16

III. Summary Judgment Standard…………………………………………..……..18

IV. Argument…………………………………………………………………..……..18

    A.    Burress Met All Administrative Prerequisites by Timely Filing His Charge……….18

    B.    EEOC Has Established the Elements of its ADA Failure to Hire Claim…………....19

        1.    Burress is Disabled Under the ADA………………………………….........20

        2.    A Reasonable Jury Could Determine that Burress Is a Qualified Individual..21
              a.    OHC Never Identified any Actual Essential Functions Burress
                  Could Not Do…………………………………………………….........21

        b.     Burress's Track Record Shows He Could Perform All the Essential Functions…………………………………………………………......23

    3.     OTK Rescinded Burress's Offer Based on His Anxiety Disability………...24

C.    Burress Did Not Pose a Direct Threat………………………………………......25

D.    The Parties Dispute Whether OTK Could Have Accommodated Burress or Even Needed To………..………………………………..……………………….......30

E.    OTK's Alleged "After-Acquired Evidence" Is No Defense…………………………33

F.    OTK's Basis to Rescind Burress's Job Was a Pretext for Disability Discrimination ……………………………………...……………………………………….34

V.    Conclusion ……………………………………………………………………………36

I.        **INTRODUCTION**

Plaintiff, United States Equal Employment Opportunity Commission ("EEOC"), hereby responds in opposition to Defendant, Outokumpu Stainless USA, LLC's ("Defendant" or "OTK") Motion for Summary Judgment and supporting Memorandum of Law. Docs. 54, 55.

OTK recruited Jared Burress to work for it because of his experience and flawless safety record while performing substantially similar work for a competitor, yet rescinded his job offer once it learned he takes physician-prescribed Xanax some nights before bed. OTK simply assumed that the *possible* side effects of that medication would prevent Burress from performing its job safely, even though he had performed similar work without issue, and did so without conducting an individualized assessment of how Xanax affected Burress. Indeed, OTK rescinded his job offer without seeking basic information about how and when Burress used Xanax, or whether he ever experienced actual side effects, and without determining the probability of any risk or severity of actual harm Burress's individual use of Xanax posed. Moreover, OTK can cite no regulation, medical or industry standard, or statement from the drug manufacturer of Xanax that its usage bars individuals from working a sensitive-safety-job. Unable to find such support, OTK now asks this Court for such a blanket prohibition, to bless its reliance on assumptions about possible side effects, rather than an individualized assessment of Burress and actual side effects, if any. OTK compounded its ADA violation by ignoring Burress's attempts to initiate the interactive process to determine whether he could perform the job with an accommodation or even needed one because he voluntarily stopped using Xanax immediately after OTK rescinded his job offer.

Summary judgment is improper because, at the least, there are genuine issues of fact regarding whether OTK violated the Americans with Disabilities Act, as amended ("ADA"), by rescinding Burress's offer based on generalized assumptions, rather than an individualized assessment using the most current medical knowledge or best available objective evidence, and ignoring Burress's attempts

1

to initiate the interactive process mandated by the ADA.

## II.    STATEMENT OF FACTS[1]

### A.    Burress Has Experience in Hazardous Jobs and a Flawless Safety Record

Burress has worked for over ten years in hazardous, heavy industrial settings. PX 4, p. 6; PX 32, 23:16-32:10; 47:5-58:2; PX 28 ¶¶ 14-19. He has never been terminated, disciplined for any safety issue, or involved in any workplace safety incident. PX 32, 35:23-36:16, 58:3-59:7, 66:3-5; PX 28 ¶ 18.[2] All of Burress's employers were aware that he had a prescription for Xanax and let him work without restriction. PX 32, 36:17-37:23, 38:1-13, 46:6-11, 64:2-5, 71:12-72:3, 215:4-217:3; PX 28 ¶ 20. None of Burress's employers restricted him from performing any hazardous or "safety sensitive" duties or using any tools, equipment or powered industrial vehicles. PX 28 ¶ 20.

Burress is a certified forklift driver and Senior Crane Operator with experience using several types of cranes, plasma cutting machines, track torches, powered industrial vehicles (such as Bobcats, all terrain forklifts and material handlers), and other industrial power tools and equipment. PX 28 ¶ 14-19; PX 32, 27:1-21, 30:5-21, 52:21-23. From 2011 to 2016, he worked for SSAB as an Entry Level Maintenance Operator and qualified Maintenance Operator in the metal casting department and on Quench Lines in the same extreme heat and hazardous conditions found in OTK's Melt Shop. PX 32, 48:2-57:3; PX 28 ¶¶ 14-19. Doc 56-3, ¶ 4; Doc. 56-4, ¶¶ 6-7. SSAB manufactures carbon steel and is thus a competitor of OTK, which manufactures stainless steel. PX 35,[3] 15:17-17:19; PX 32, 60:9-14,

---

[1] Contemporaneously with this response, the EEOC is filing a Motion to Strike, or in the Alternative Objections to Declarations filed by OTK as part of its Evidentiary Submission.

[2] OTK subpoenaed Burress's former employers for reports of safety incidents and his employers confirmed he had no such incidents. PX 31.

[3] Thomas Hayden has worked 21 years in the steel industry including in Outokumpu's Melt Shop from 2011-2018 as a manager and since 2018 for SSAB where he is superintendent of primary operations, which includes supervision of SSAB's Melt Shop PX 35, 5:1-18, 12:24-19:23, 57:12-58:6.

137:11-138:1, 140:19-141:3. SSAB's casting department uses essentially the same process to convert scrap metal into molten steel as OTK to manufacture steel and has "very much the same" hazards as OTK's Melt Shop. PX 35, 15:17-17:19, 36:16-37:12. Burress has worked (without incident) around continuous hazards with the potential to cause serious injury or death which required him to be always alert, aware of his surroundings and able to immediately react to any hazardous situation. PX 28 ¶ 18.[4]

### B. Burress's Anxiety Diagnosis and Use of Xanax

Burress began seeing psychiatrist Dr. James Edwards in 2014, after the deaths of his mother and brother. PX 1 ¶¶ 2-4. Dr. Edwards treated Burress for ADD and anxiety until 2019. PX 1 ¶ 3.[5] Dr. Edwards prescribed a low dose of 0.5 mg alprazolam[6] (brand name Xanax) to be taken up to twice a day, primarily to help Burress sleep and to treat any panic attacks if they occurred.[7] PX 1 ¶¶ 3-5, 8.

Dr. Edwards saw Burress every three months, on average, and confirmed during each visit

---

[4] When OTK recruited Burress in 2018, he was working for Ryerson, a metal fabrication company, running a plasma cutting machine. PX 32, 69:11-22, 70:7-71:11. For the past three years, Burress has worked for Total Plate Processing ("TPP") on the same SSAB job site as a Machine Operator and a Senior Crane Operator. He uses 25-ton hook-overhead cranes, remote cranes, plate roll and plasma cutting machines to cut and bend steel plates to create oil-tanker shells. PX 32, 23:16-32:10. There is a high risk of electrical shock and a number of hazards requiring him to be alert at all times. PX 32, 31:9-32:10. Both SSAB and TPP recommended Burress to join their safety committees. PX 32, 32:11-33:3.

[5] *See also,* PX 1 ¶¶ 1-16. Anxiety can impact the ability to sleep, and disrupted sleep can impact the ability to think, concentrate or pay attention. PX 40, 218:15-23. When Burress's anxiety kept him from sleeping well, that made it difficult to think, concentrate or pay attention the next day. PX 42 ¶ 2.

[6] Xanax, a Schedule 4 drug with a low risk for abuse, is a short-acting benzodiazepine prescribed for anxiety and sleep disorders. PX. 40, 124:20-125:7.

[7] Burress only mentioned panic attacks when he initially saw Dr. Edwards in 2014 and they were "not frequent enough to be a concern to him." PX 39, 69:18-70:6. He never sought emergency medical treatment for a panic attack. PX 32, 91:8-22. The one and only occasion when Burress had an anxiety attack at work was in 2015 and he has not experienced one since 2015. PX 32, 88:21-89:2; PX 42 ¶ 3. Panic attacks were not a basis for rescinding Burress's job. OTK did no analysis of the likelihood that he would have a panic attack at work and no one at OTK or OHC asked him about the frequency of his panic attacks. PX 34, 146:2-147:8. *See also*, *infra*, footnote 47.

that he was taking Xanax responsibly and appropriately. PX 1 ¶ 7. Burress experienced no side effects from Xanax at work. PX 1 ¶¶ 7-8. Although he twice reported drowsiness in 2015, this was a desired effect of a medication intended to promote a restful night of sleep when used before bed. PX 1 ¶¶ 8-9; PX 28 ¶ 2; PX 39, 112:21-113:18. Burress always took Xanax more than five hours before his next shift to prevent the risk of feeling drowsy at work. PX 28 ¶ 2; PX 32, 119:11-18. He never fell asleep at work after taking Xanax well in advance of a shift, nor did he ever even feel drowsy, lethargic or inattentive at work on account of Xanax. PX 28 ¶ 2.

Xanax is a short-acting benzodiazepine without residual effects the next day. PX 11, p. 10-11; PX 40, 125:7-14, 202:3-203:16, 218:24-219:5. Drowsiness and lethargy are not common side effects of Xanax, though they do occur. PX. 40, 125:21-24. In any event, Xanax no longer effects a person after five hours. PX 40, 219:18-23.[8] Thus, a person taking Xanax to sleep at night could not pose a risk the next day. PX 40, 169:1-13, 202:3-203:16, 219:7-23, 220:24-221:6; PX 11, p. 7.

### C.    OTK Recruited and Offered Burress a Job

OTK recruited Burress and, after an interview with a panel, made him a conditional offer of employment as an Entry Operator in the LTS/CCM/SGP department, the Melt Shop, with a start date of September 4, 2018. PX 33, 71:25-72:4; PX 13; PX 16; PX 33, 38:6-39:10, 69:9-71:24; PX 32, 131:3-14,140:4-18; 147:11-148:3. This job involved work similar to his prior casting department job at SSAB, PX 32, 142:10-22, 143:13-144:3, and  was conditioned on Burress successfully completing a criminal background check and pre-employment physical exam ("PPE"). PX 34, 18:18-19:4, PX 33, 41:15-42:17. [9]

---

[8] Even Dr. Taylor testified that a worker who took Xanax eight hours before a shift would not experience lingering effects while on duty. PX 41, 100:17-101:2.

[9] A more detailed chronological summary of dates during the hiring process and supporting documents is provided in the deposition of Marva Rodrigues as OTK's 30(b)(6) witness. PX 34, 72:18-77:18.

OTK's ideal candidate for the Melt Shop had manufacturing experience, particularly casting or melt shop experience, because such candidates had worked in hazardous environments and around hazards similar to those in its Melt Shop. PX 3; PX 33, 37:7-38:2; PX 34, 13:14-15:9; PX 37, 36:11-39:24; PX 35, 49:24-51:7. OTK also looked for experience on a safety team. PX 3. The interview panel determined that Burress was qualified for the position. PX 34, 11:18-23.

### D.     Burress Underwent Pre-Employment Examinations at OHC

Since the Melt Shop opened in 2012, OTK has contracted with a third-party medical clinic, Occupational Health Clinic ("OHC") as its sole provider of PPEs. PX 34, 22:15-23; 24:5; PX 38, 24:20-25:4; PX 33, 46:21-25. Burress underwent his PPE at OHC on August 28, 2018 and September 4, 2018. PX7; PX 11, p. 3-4.

Laura Danielson, a Certified Registered Nurse Practitioner at OHC, conducted Burress's PPE. PX 38, 7:15-19, 18:3-6, 49:3-50:5, 114:10-149:8. She does not recall Burress or any discussion with him. PX 38, 111:6-12, 114:4-13, 121:9-12. When she walked in the room for Burress's PPE, she said, "I remember you from the last time, do you still take xanex [sic]?" PX 30; PX 32, 172:15-173:4.

Danielson had previously performed Burress's PPE in January 2018 when he applied for a dump truck position with another employer, TMS International, who rescinded his job offer following his PPE. PX 6; PX 38, 80:2-112:6; PX 32, 153:22-161:19, 160:15-162:1. In the January exam for TMS, Burress disclosed he took "xanex-periodically" [sic]. PX6, p.4. Burress passed his drug screen in January 2018, indicating Xanax was not in his system. PX 38, 81:18-82:18. OHC sent Dr. Edwards a form to complete on which Dr. Edwards cleared Burress to work with no restrictions. PX 6, p. 7; PX 38, 96:2-98:12; PX 1 ¶ 10. OHC did not ask Dr. Edwards for Burress's medical records and the form did not ask for any details of the prescription, asking only for a list of "Current medications prescribed." PX 6, p. 7; PX 1 ¶ 14. In particular, Danielson (and OHC) never asked about Burress's dosage, frequency, or whether he experienced actual side effects. PX 1 ¶ 14; PX 6; PX 38, 89:7-11,

92:10-93:8, 96:2-100:11; PX 32, 217:19-218:17.

Nonetheless, in January 2018, Danielson determined that Burress should not be cleared for "safety sensitive duties" or "operating heavy industrial equipment" at TMS simply because he took Xanax, ***regardless of how it affected him individually***. PX 6, p. 8; PX 38, 101:1–108:6, 110:19-111:5. Xanax was her sole basis for this restriction. PX 38, 91:25-92:4, 110:12-111:5. Danielson acknowledged, "[I]t's difficult to know if I thought the side effects were relevant at that point." PX 38, 93:23-25. Although she knew Xanax had a ***possible*** side effect of drowsiness, she did not know if it actually made Buress drowsy or if he took it at work. PX 38, 93:11-95:8.

During his PPE for Defendant, Burress again disclosed on a medical history form that he was prescribed Xanax 0.5mg. PX 7, p. 5. Burress's drug test again indicated he had no Xanax in his system. PX 38, 124:6-126:4, 127:5-128:11, 130:60-10. Danielson documented he took Xanax "PRN," meaning as needed, but failed to inquire how often he actually took it. PX 38, 150:6-20. Danielson did not know how often he took it, whether he took it during work hours, or whether he had any of the potential side effects. She did not ask Burress or contact Dr. Edwards for any of that information. PX 38, 50:12-16, 128:24-129:15, 151:25-152:9, 156:3-16.

On September 4 and 6, 2018, Burress telephoned Dr. Edwards requesting he send a list of his medications to OHC as part of the hiring process for a new job. PX 1 ¶ 13. Dr. Edwards sent a letter dated September 6, 2018 that stated Burress was prescribed Xanax 0.5 mg to "take as needed for Panic Disorder" and stated, "Should you have any questions regarding this prescription, please feel free to contact me at the number listed above." PX 7, p. 29. Danielson does not recall if she received and reviewed the letter, did not document doing so, and does not know if anyone at OHC called Dr. Edwards to ask follow-up questions. PX 38, 136:24-138:15, 146:16-147:8, 148:19-149:5. OHC never requested that Dr. Edwards provide Burress's medical records. PX 38, 151:15-152:7.

Danielson documented on the PPE Report she believed that Burress "can perform the essential

job functions with accommodation [of] no safety sensitive duties." PX 7, p. 27. She did not check the box for "Cannot perform essential job functions" or "Would present a direct threat to him or herself or others."[10] Before issuing the results of this PPE, no one at OHC determined what time of day he took Xanax, how frequently he took it, or if he had any side effects. PX 32, 217:19-218:17; PX 38, 89:7-11, 92:10-93:8. Danielson never reviewed medical journals or publications regarding whether Xanax caused a safety risk for people working in a safety sensitive job. PX 38, 155:6-156:1. Danielson's opinion was based on the *possible side effects* she recalled from the Pfizer drug insert but she never asked Burress if he actually experienced those side effects. PX 38, 155:6-156:16. Danielson admitted that she was mistaken and that the Pfizer drug insert warning actually said, "until you experience how this medication affects you, do not drive a car or operate heavy machinery," which does not mean everyone who takes Xanax is forever unable to drive a car or operate heavy machinery. PX 38, 156:17-158:21; PX 9, p. 9. Dr. Terry Taylor, her supervising physician, agreed.[11] PX 41, 73:21-74:1, 77:13-80:21, 94:23-96:13.

OHC reported the outcome of the PPE to OTK in a Pre-Employment Exam Report and other pages from the exam. PX 34, 22:1-10; PX 33, 45:9-46:20, 47:15-51:6; PX 7, p. 27.[12] The OHC documentation stated that Burress took Xanax "PRN."[13] PX 34 77:19-78:11. Marva Rodrigues,

---

[10] Danielson does not recall discussing Burress with her supervising physician, Dr. Terry Taylor. She would have discussed only what was in the PPE records. PX 38, 152:10-20. Burress had no interaction with Dr. Taylor. PX 32, 195:2-4. If Taylor had been consulted, he would have "advised Ms. Danielson to be conservative in her approach" meaning "we don't put the applicant or coworkers at risk until we've more clearly defined the risk." PX 41, 82:1-8. Indeed, "a conservative decision was made" though OHC did not seek medical records from the prescribing physician to clarify the risk. PX 41, 91:24-92:4.

[11] Dr. Terry Taylor is the Medical Director of OHC and OTK's Medical Review Officer. PX 41,19:9-20:14, 27:17-28:25. He did not conduct Burress's PEEs at OHC, does not recall discussions with Danielson about Burress, and deferred to Danielson's recall of events. PX 41, 64:11-14, 69:12-70:3, 73:2-7, 77:17-78:18, 81:10-25, 90:5-24.

[12] OTK destroyed Burress's applicant file in 2019. PX 33, 52:22-53:10, 77:7-20.

[13] Rodrigues did not know what "PRN" meant and no one at OTK ever found out how often Burress took Xanax. PX 34, 77:19-78:11. PRN is means to take as needed. PX 38, 50:21-23.

7

OTK's HR Business Partner assigned to the Melt Shop, received OHC's report and exam documents on September 4, 2018.[14] PX 33, 73:20-75:9. She never contacted OHC to clarify anything regarding the PPE results and never spoke to Danielson or Dr. Taylor about Burress. PX 33, 63:23-64:1, 100:6-9, 104:7-13.

### E.    OTK Ignored Burress's Attempts to Discuss His Disqualification

After his PPE, Burress contacted OHC and Rodrigues multiple times to try to provide information from his pharmacy and Dr. Edwards. PX 18; PX 19; PX 20; PX 28 ¶¶ 6-7. Rodrigues assumed that these texts were due to Burress trying to talk to OHC and have his doctor come to an agreement with OHC about documentation to show that he could work in a safety-sensitive environment. PX 33, 79:6-82:16.

Rodrigues decided to rescind Burress's offer based solely on OHC's PPE. PX 33, 106:16-107:7; PX 34, 52:3-53:6. Rodrigues called Burress on September 7, 2018 to tell him his job offer was rescinded due to a problem with his PPE. PX 21; PX 33, 53:12-55:4, 86:8-22, 111:6-22. Burress asked if the decision had anything to do with his medication and said this happened before at OHC and he was going to reach out to his doctor and OHC to get it cleared up. PX 32, 72:22-74:3, 183:12-184:14; PX 33, 55:5-56:25; PX 34, 78:19-79:11. Burress then unsuccessfully attempted to contact OTK and OHC multiple times to discuss the decision to rescind his offer. PX 32, 175:9-176:22, 180:1-181:9, 188:21-189:21; PX 30; PX 33, 82:17-83:7, 85:20-86:22, 112:13-114:4; PX 28 ¶ 7-13. Rodrigues knew that Burress was trying to contact her to see what he could do to convince OHC to change its position and OTK to reconsider rescinding his job. PX 33, 116:5-13. No one at OTK ever responded

---

[14] Danielson disputes this. Danielson claims she would not have finalized the PPE Report until after she reviewed Dr. Edwards's September 6, 2018 letter, although she cannot recall doing so and she dated the report September 4, 2018. PX 38, 142:7-146:15.

to Burress. PX 34, 39:10-42:3,77:9-18; PX 33, 41:10-42:3, 85:20-89:1, 116:14-25; PX 32, 184:12-14.

OTK did not give Burress or OHC a copy of OTK's ADA policy, or instruct them how an applicant should request accommodation, or appeal a medical restriction, or notify OTK that OHC lacked relevant medical information when it made its recommendation. PX 28 ¶ 13; PX 34, 53:10-55:2, 61:14-62:16,65:3-67:25; PX 33, 109:4-9, 120:11-121:25, 125:4-15, 145:13-18. PX 20. Rodrigues acknowledges she had a "responsibility" if OHC advised her that a person had a medical restriction to engage with the person to "see if there is any accommodation that can be met" that OTK approved. PX 33, 149:8-151:4. It is undisputed that neither Rodrigues nor anyone else at OTK did so.

### F.   OTK Never Considered Reinstating Burress's Offer

OTK's only basis for not hiring Burress was OHC's determination that ***potential*** side effects of Xanax meant he was not able to perform safety sensitive duties. PX 34, 68:6-16, 71:13-72:17, 80:7-10; 122:19-123:9, 154:17-156:11. OTK would have hired him if Danielson cleared him for a safety sensitive position based on him not taking Xanax. PX 34, 96:18-97:9. Danielson testified that "we likely would not put any sort of safety-sensitive restriction if he were not taking Xanax." PX 38, 159:20-160:7.

During this time, Burress discontinued taking Xanax altogether on September 11, 2018, with Dr. Edwards's consent. PX 32, 122:7-125:1; Edwards ¶ Dec 15. [15] Burress has not been prescribed Xanax since that time. PX 1 ¶ 15; PX 32, 92:12-93:2. OTK acknowledges that Burress no longer posed a safety risk thereafter. PX 34, 144:9-145:13. Rodrigues never reconsidered her decision to rescind his offer, nor is there evidence OHC did so. PX 33, 97:14-17, 107:19-21.[16]

---

[15] Rodrigues or OHC were the appropriate contacts for Burress to advise he had discontinued Xanax. PX 34, 64:14-65:2, 68:17-20. He passed another drug screen on October 24, 2018. PX 34, 69:4-16, 97:14-98:18; PX 24.

[16] OHC is also unaware of any efforts to talk to Burress after the decision to rescind his job. Danielson

### G. "Safety Sensitive" Is Not an Essential Job Function

Safety-sensitive is a "term of art" that is "vague and broad by nature." PX 40, 65:2-68:22, 166:7-167:5.[17] There is no consensus about its definition. *Id.* "Every employer would say they want a safe environment. Whether that means every employer has safety-sensitive workers is another story altogether" and "in those safety important environments, not necessarily every job is safety-sensitive." PX. 40, 66:15-18, 67:18-20. Safety sensitive jobs are ones in which people are assigned to carry and use guns at work or operate commercial vehicles. PX. 40, 69:9-70-21, 179:8-180:16.[18]

Danielson believes the definition of safety sensitive comes from OSHA[19] and can mean several things, such as not working over unprotected waters or heights or with heavy equipment or machinery. PX 38, 74:3-75:20. According to OTK, it means a place where there are unspecified hazards for which a person needs to be alert and aware, though it concedes there is no statute,

---

does not know if OTK ever determined if it could accommodate Burress. PX 38 159:10-14. Danielson knows nothing about Burress's attempt to contact OHC to have a revised finding so he could get the job. PX 38, 159:15-19. OTK cannot cite anyone it has employed in a safety-sensitive job who took Xanax, or any applicant or employee taking Xanax to whom it provided an accommodation. PX 34, 115:16-116:2; PX 35, 68:20-69:21.

Beginning in 2019, OTK adopted a formal process of sending a letter to applicants whose job was rescinded following a PPE to invite discussion of whether the applicant had a disability and could be accommodated. PX 34, 55:3-57:17, 69:17-71:3; PX 33, 42:17-43:9; PX 12, p. 3-5. OTK's pre-2019 procedure placed the onus on the applicant to let OTK know of a requested accommodation, even though the applicant did not have the benefit of the PPE report or instructions how to make the request. PX 34, 62:19-63:2. OTK could not cite to any occasion when OTK asked OHC to reconsider a safety-sensitive restriction for an applicant or employee who took Xanax or offered an applicant an accommodation due to his prescription medication. PX 34, 54:14-17, 116:5-24. Although OTK states it had an "informal" process prior to 2019, OTK does not claim that any kind of collaborative discussion occurred with Burress to discuss accommodation. PX 34, 57:1-64:13. OTK cannot cite any example of when there was a collaborative discussion regarding whether to accommodate an applicant where the issue of direct threat arose. PX 34, 57:18-61:7.

[17] Dr. Taylor described the term as a job where the person performing it could affect the health and safety of himself or other employees and, "you know it when you see it." PX 41, 30:1-32:6.

[18] Steel industry jobs are not in the top 25 mortality occupations. PX 40, 46:13-20.

[19] OSHA's "general duty clause" is a vague policy statement or catch-all regulation that could provide this general overarching policy. DX 4 to Swotinsky; PX. 40, 50:23-53:22. It does not include guidelines or recommendations regarding qualifications for hiring. PX 35, 61:2-13.

regulation or accepted definition of the term. PX 34, 15:13-17:12. OTK's former Melt Shop Manager and Director of Environmental Health and Safety[20] admit they have not been provided a specific definition. PX 36, 48:20-50:2; PX 35, 52:25-53:16. The Safety Director believes it means an "*environment* like the Melt Shop" with constant hazards and where failure to safely perform or immediately respond could result in injury or death. Doc. 56-3 ¶ 5. On Burress's PPE Report, Danielson documented that Burress "can perform the essential job functions with accommodation [of] no safety sensitive duties." PX 7, p. 27. OHC never defined the specific "safety sensitive" duties that Burress could not do safely. PX 34, 80:11-81:17; PX. 40, 111:23-113:14-24. She did not check the box indicating Burress "would present a direct threat to him or herself, or to others." PX 7, p. 27; PX 33, 100:10-101:1. Thus, she did not state that he could not perform the essential functions. She misunderstood that an accommodation is an action to help Burress perform the essential job functions, not something that would disqualify him from the job. PX 40, 120:10-121:1. It is "internally inconsistent" and "doesn't make sense" to say Burress can do the melt shop operator job but not safety-sensitive work. PX 40, 122:5-15, 155:16-156:7. However, OTK read Danielson's documentation as a disqualification and withdrew Burress's job offer. PX 40, 122:16-123:9.

    **H.**    **OHC and OTK Cannot Prove Burress Posed an Actual Threat**

        **1.**    **OTK Has No Medical, Scientific or Even Anecdotal Evidence Xanax Has Caused Safety Incidents**

Although OTK investigates safety incidents and non-negative drug screens of employees,

---

[20] Wayne Denton, Director of Environmental Health and Safety since May 2016 is the highest-ranking safety-related employee at Outokumpu' s locations in the Americas and has worked in the steel industry roughly 27 years. PX 36, 34:17-35:1, 40:5-12. At Outokumpu, he is informed about all safety incidents and personally involved in investigation of any major safety incidents, and safety managers under him are aware of post-incident drug testing results. PX 36, 24:18-23, 29:17-33:1, 52:19-55:17. He collaborates with safety directors at other locations to analyze safety incidents, has a monthly CEO safety call with people from the entire company, and is aware of any recordable safety incident throughout the company internationally. PX 36, 35:3-40:4

neither its highly experienced former Melt Shop Manager nor its Director of Environmental Health and Safety are aware of any actual incidents, safety violations, or on the job accident or injury where Xanax was considered to be a causal factor, including any anecdotal evidence[21] about such an occurrence. PX 15; PX 34, 24:5-29:11, 108:9-110:3; PX 36, 59:21-61:23, 63:7-20, 66:23-67:23; PX 35, 63:9-74:6; PX 33, 145:25-147:23, 148:187-149:6. The Safety Director is also unaware of OTK ever doing any analysis of the type of safety concern, if any, that someone taking Xanax might pose, including the probability or risk or the magnitude of that risk. PX 36, 62:11-67:23, 69:13-25, 71:4-8. OTK is also unaware of any medical or scientific information from any source that says that an individual taking Xanax (even outside work hours) should not be assigned safety-sensitive duties. PX 34, 108:20-110:3; PX 36, 15:1-21:12, 61:22-62:25, 63:21-64:1; PX 35, 78:22-79:24. According to the EEOC's expert witness, "There are no guidelines or consensus among medical professionals that the well-regulated,[22] long-term use of benzodiazepines makes one unfit for work." PX 40, 178:17-179:7.

### 2.    OTK Did Not "Individually Assess" Any Risk Posed by Burress

OTK admits that, to "determine if an individual's disability presents a direct threat, the employer must make an individualized assessment" of four factors: duration of the risk, nature and severity of the potential harm, likelihood that potential harm will occur, and imminence of the potential harm. PX 23, p. 42; PX 34, 141:18-144:8. In addition, "Risk must be documented by objective medical or other factual evidence regarding the particular individual. Even if a genuine

---

[21] The only anecdotal evidence provided by defense witnesses was not about Xanax. The former Melt Shop Manager recalled an incident not at OTK where an employee was confused at work and transported offsite, where it was determined he was taking an abusive level of antianxiety medication. PX 35, 74:18-76:24.

[22] Well-regulated meaning taking the same amount, being monitored by a doctor, and not using other non-prescribed drugs. PX 40, 177:1-178:1. Dr. Edwards saw Burress approximately every three months from 2014 to 2019. PX 39, 92:7-93:1

significant risk of substantial harm exists, the employer must consider whether it can be eliminated or reduced below the level of a direct threat by a reasonable accommodation." PX 23, p. 42.

OTK admits it had no objective medical or factual evidence of any specific threat Burress posed and relied solely on OHC's recommendation he not work in a safety-sensitive role. PX 34, 147:9-148:7, 156:18-157:20. It also made no individualized assessment of the likelihood that Burress would pose an actual threat to workplace safety or the potential magnitude of that harm, relying only on Danielson's misunderstanding of the Pfizer drug warnings. PX 34, 101:14-103:14; PX 38, 155:6-158:21. OTK did not know any actual side effects Burress had before it decided not to hire him. PX 34, 103:15-105:14, 145:14-146:1.[23] OHC did not tell OTK any *specific* hazards Xanax poses for individuals in safety-sensitive positions, or what *specific* threat Burress posed. PX 34, 68:1-5, 115:4-14. Rodrigues never determined whether Burress took Xanax during work hours or had side effects and OTK never analyzed which duties Burress could not safely do while on Xanax. PX 34, 79:13-30, 81:15-17; PX 33, 110:15-112:12.

### 3.    OHC Disqualified Burress Based on Assumption and Incomplete Information, Not Medical Facts

When an occupational medicine physician has no doctor-patient relationship with an applicant, the physician should request additional information if a medication raises a concern. PX, 40 31:18-32:20, 36:21-38:1, 40:5-20.[24] For a significant medication issue, the doctor should obtain the applicant's medical records and put the exam on hold until he has the necessary information to clear the person to work or determines that he cannot reach a determination because he has inadequate

---

[23] OTK acknowledges that the Pfizer drug insert (PX 9) indicates some individuals may be able to operate potentially dangerous machinery while taking Xanax and that it would have been reasonable to confirm whether Burress experienced side effects before restricting him from safety sensitive duties. PX 34, 99:21-101:13.

[24] There are multiple more reliable ways to obtain this information than relying on an applicant's self-reporting or requesting information from his physician using a form. PX 40, 32:21-34:17, 36:4-18, 39:6-40:4, 94:20-95:15,109:5-18.

information. PX 40, 34:18-36:3. If the occupational medicine physician disagrees with the prescribing physician, the two doctors should attempt to reach consensus before a decision is made. PX 11, p. 9-11.

The record does not clearly show that OHC reviewed Dr. Edwards's September 6, 2018 letter, or considered any other medical or pharmacy records. PX 11. p. 4; PX 40, 134:22-135:22, 223:16-224:19. Burress contacted Dr. Edwards to request a list of his medications. PX 1 ¶ 13. OHC never attempted to contact Dr. Edwards before making its decision and recommendation to OTK.[25] PX 11, p. 4; PX 40, 127:4-128:22, 189:14-190:13.[26]

Had OHC contacted Dr. Edwards or reviewed Burress's medical records, it would have learned that Dr. Edwards had explicitly documented Burress had no side effects from Xanax. PX1 ¶ 7. In the opinion of Dr. Edwards, who knew that Burress had worked in steel mills and as an Uber driver, Burress was able to work in a safety-sensitive role because he had no side effects from the medication that could impair his work. PX 39, 51:7-21, 68:3-13, 107:10-108:2; PX 1 ¶ 10. He judged Burress to be "stable," "doing well" and "functioning normally." PX 39, 86:20-87:8; PX 1 ¶ 15. It is Dr. Edwards's clinical observation and professional opinion that Burress took Xanax responsibly and appropriately and did not experience side effects that prevented him from working safely. PX 1 ¶¶ 6-9.

Because OHC did not have complete or accurate information, it did not base its decision on the most current medical knowledge or best available objective evidence. PX 34, 107:19-108:1. OHC

---

[25] In addition to gathering information relevant to fitness for duty, this conversation may help the prescriber and patient understand that discontinuing Xanax could be considered to qualify for a job, similar to the process that DOT drug testing regulations advise. PX 40, 221:7-223:15.

[26] In Dr. Swotinsky's experience working with Concentra, the nation's largest occupational health provider, an occupation health provider should rely heavily on the treating physician's opinion and tend to go with that. PX 40, 198:1-18. OHC's Standard Operating Procedure provides for reviewing medical records and/or having discussions with the applicant's physician, a procedure it failed to follow with Burress. PX 2; PX 11, p. 10; PX. 40, 198:19-199:12.

noted no clinical findings to show whether or how Xanax adversely affected Burress. PX 40, 97:19-98:21. OHC had incomplete information regarding whether Xanax actually caused Burress side effects when it sent the PPE Report. PX 34, 84:22-85:2.27 At best, OHC based its decision on the **_mere possibility_** of side effects from Xanax and not side effects actually known to affect Burress. PX 34, 108:4-8.

Danielson never reviewed medical journals or publications regarding whether Xanax causes a safety risk for people working in a safety sensitive job. PX 38, 155:6-156:1. She had only reviewed the Pfizer drug insert at some unknown prior time, which she misunderstood to state that Xanax can cause cognitive impairment or sedative effects such that you "shouldn't take it and operate heavy equipment." PX 38, 155:6-156:1. Danielson testified she was mistaken and that the drug insert actually says, "**_until you experience how this medication affects you_**, do not drive a car or operate heavy machinery." PX 38, 156:17-158:21; PX 9, p. 9 (emphasis added). This language clearly permits a patient to drive a car or operate heavy machinery once they understand how the medicine affects them as an individual. Dr. Taylor agreed. PX 41, 73:21-74:1, 77:13-80:21, 94:23-96:13.

Danielson based her determination about Burress on the fact that Xanax **_might_** cause side effects, without ever asking him if he experienced side effects. PX 38, 156:1-16; PX. 40, 230:12-231:14. Danielson did not know, because she did not ask, whether Xanax made Burress drowsy, or whether he took it during work hours. PX 38, 94:13-95:8. Without knowing how Xanax affected Burress individually, OHC was unable to determine whether Burress posed any safety risk. PX 38, 154:14-25.

Danielson and Dr. Taylor each conceded in deposition that it would have been relevant to

---

[27] For a partial listing of details that OHC was missing, *see* PX 34, 81:19-87:7. Neither OHC or OTK ever discussed with Burress if he was willing to discontinue the medication or willing to only take it more than 8 hours before reporting to work, or if he ever had a safety incident, or near miss difficulty operating heavy machinery due to his medication. PX 34, 86:2-87:7.

have determined how Xanax individually affected Burress before restricting him from a safety sensitive job. PX 38, 158:17-159:6; PX 41, 80:14-21.[28] OHC did not do so. PX 38, 156:13-16, 158:23-159:6. OHC twice disqualified Burress from "safety-sensitive work" for Xanax, in January and September 2018, evidencing that OHC bars patients on Xanax from any safety-sensitive work. PX. 40, 114:2-14,147:6-18, 178:17-179:7.

I.    **Dr. Swotinsky's Opinions and Testimony are Unrefuted by Any Expert and Establishes Material Questions of Fact**

The EEOC engaged Dr. Robert Swotinsky as an occupational medicine expert to opine whether it was reasonable and appropriate to disqualify Burress from safety sensitive duties based on his Xanax prescription. PX 10; PX 40, 146:11-24; PX 11, p. 1-12. His qualifications and experience are summarized on his *curriculum vitae*. PX 11, Appendix 3. He is currently licensed to practice medicine in several states. PX 40, 20:3-19. He is an experienced occupational medicine physician who has researched and written on ADA-related topics and conducted PPEs for steel manufacturing employers. PX 40, 20:20-21:16, 22:14-22, 23:2-25:8, 27:12-29:11, 43:12-45:19, 145:3-146:10, 219:24-220:20. OTK has not identified any expert witness to refute Dr. Swotinsky's testimony and opinions.

According to Dr. Swotinsky, manufacturer drug warnings such as "be careful when driving a motor vehicle or operating machinery" are broadly used and "do not necessarily define likely safety risks." PX 11, p. 5 PX. 40, 149:19-150:2. Thus, occupational physicians should not rely solely on

---

[28] Dr. Taylor acknowledged that in making its recommendation about accommodation, OHC did not assess the likelihood or probability of risk Burress would pose performing safety-sensitive duties. PX 41, 82:14-86:9. Dr. Taylor also acknowledged that OHC had incomplete information from Burress's physician about his Xanax. PX 41, 88:7-21. Dr. Taylor deferred to Danielson because he did not perform the exam and did not know how often Burress took Xanax, whether he took it during work hours, or if he had side effects. *Id.* at 88:24-90:24. Dr. Taylor was unable to reference any specific facts about how Xanax affected Burress or how he used it, or any medical publication that supported a finding he was a risk. *Id.* at 90:24-94:22. He relied on his experience in dealing with other patients, not Burress. *Id.* at 94:17-22.

warnings in manufacturer drug inserts to assess someone's ability to perform a job because such an assessment requires individualized determinations about medication use. PX 11, p. 5; PX 40, 149:13-18, 150:2- 152:12, 160:8-161:10. "If decision making was this simple it would not require a health care provider's involvement." PX 11, p. 6. "The point is, Pfizer's package insert advises that the use of Xanax may or may not pose a significant risk" and the doctor must keep this potential risk in mind, while also looking at patient-specific factors such "reported side effects (which can vary widely between people) and other factors." PX 11, p. 6.

According to Dr. Swotinsky, it is not "very reasonable or appropriate" to disqualify Burress based on an unsupported "assumption that having prescription for Xanax and/or … a history of anxiety makes one disqualified." PX 40, 173:7-10, 227:16-231:17. Rather than disqualify Burress based on a general drug warning about possible risks, OHC had a responsibility to conduct a due diligence review of what the job entails, the dosage, actual individual side effects, when the medication was taken, how long he had been on it, review medical and pharmacy records and discuss the matter with Dr. Edwards. PX 11, p. 9-11; PX 40, 113:9-13, 152:13-154:13, 155:16- 158:14 160:6-161:10, 224:20-227:15. Disqualifying someone from operating heavy industrial equipment or working in a safety-sensitive job based on Xanax is "unusual" because it is "not a slam-dunk disqualifier." PX 11, p. 5; PX 40, 112:21-113:3, 136:4-137:5, 180:17-181:16. "There is no verifiable information in this case that it posed a risk." PX 40, 229:17-21. Dr. Swotinsky would not have disqualified Burress "just based on the Xanax" without doing "due diligence in trying to assess whether this guy is or isn't fit for duty." PX 40, 213:8-215:1.[29] Dr. Swotinsky's medical opinion is that Burress posed no direct threat. PX. 40, 231:23-233:5. Danielson agreed. PX 7, p. 27; PX 33, 100:10-101:1.

---

[29] OTK misconstrues Dr. Swotinsky's testimony as stating he would not clear Mr. Burress. *Id.* This is not an accurate summary of his testimony.

### III.    SUMMARY JUDGMENT STANDARD

A district court should only grant summary judgment if "materials in the record" demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A court must view all justifiable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The evidence presented to the court is always construed in favor of the party opposing the motion. *Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

### IV.    LEGAL ARGUMENT

### A.    Burress Met All Administrative Prerequisites by Timely Filing His Charge

In Alabama, a charge of discrimination must be filed with the EEOC within 180 days after the alleged unlawful employment practice occurred. *Jones v. Dillard's, Inc.*, 331 F.3d 1259 (11th Cir. 2003).[30] Because OTK notified Burress on September 7, 2018 that it was rescinding its conditional job offer (Doc. 55, p. 16), Buress had until March 6, 2019, to file a charge with the EEOC.  Buress filed a handwritten, verified charge on February 4, 2019, well within the 180-day period. PX 25.

Buress's February 4, 2019, charge fulfills the requirements of an EEOC charge. The statute provides: "Charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires." 42 U.S.C.A. § 2000e-5. "[A] charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b). *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1318 (11th Cir. 2001) (quoting same)). The handwritten charge is on EEOC form 5(A) and identifies OTK and OHC as the

---

[30] The procedures of 42 U.S.C. § 2000e–5, which governs Title VII, apply to ADA claims. 42 U.S.C. § 12117(a).

organizations who discriminated against Buress on the basis of disability. PX 25. Buress further stated

the reason given for the rescission of his offer of employment and the circumstances of his Xanax

prescription. *Id.* The fact that some portions of the form were handwritten is inconsequential. *E.E.O.C.*

*v. Joe Ryan Enterprises, Inc.*, No. 3:11-CV-0795-MEF, 2013 WL 1294696, at *4 (M.D. Ala. Mar.

28, 2013) (finding handwritten letter to constitute a timely charge with EEOC). Buress fulfilled the

oath requirement by signing the charge under the penalty of perjury. *See* 28 U.S.C. § 1746 (declaration

made under penalty of perjury generally may be used in place of an oath before a notary).

Buress's typewritten charge filed with the EEOC on March 12, 2019 merely amended his

handwritten charge that had been timely filed on February 4, 2019. PX 26, 28. "Once filed, charges

may be amended to clarify or amplify the allegations therein . . .." *Chesnut v. Ethan Allen Retail, Inc.*,

971 F. Supp. 2d 1223, 1229 (N.D. Ga. 2013) (citing 29 C.F.R. §§ 1601.12(b)). "An amendment

constitutes a mere clarification and amplification of the original charge where it only spells out in

greater detail the employee's original allegations." *Kelly v. Dun & Bradstreet Corp.*, 457 F. App'x

804, 805–06 (11th Cir. 2011) (internal citation omitted). Such is the case here. The March 12, 2019

charge, therefore, relates back to the initially filed February 4, 2019 charge and is timely. OTK cites

no cases that hold the charge filing deadline is not met by a signed, verified handwritten charge.[31]

**B.    EEOC Has Established the Elements of its ADA Failure to Hire Claim**

To establish a claim for discrimination under 42 U.S.C. § 12112(a) the plaintiff must show:

(1) he has a disability, (2) he is a qualified individual, and (3) he was discriminated against because

of his disability. *Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 828 (11th Cir. 2015).[32]

---

[31] Contrary to OTK's argument (Doc 55, p.14 ¶ 78), when OTK first received a Buress's pre-charge inquiry is irrelevant to a timeliness determination because "a charge of discrimination is considered filed upon receipt by the EEOC" and not when notice of the charge is sent to OTK. *Chesnut v. Ethan Allen Retail, Inc.*, 971 F. Supp. 2d 1223, 1230 (N.D. Ga. 2013) (citing 29 C.F.R. § 1601.13(a)(1)).
[32] OTK incorrectly asserts that the *McDonnell Douglas* burden shifting framework applies (Doc. 55, p. 18, 28) because that test is inapplicable where the plaintiff presents direct evidence of

19

### 1.    Burress is Disabled Under the ADA

OTK does not dispute that Burress has a disability, only that he is not a "qualified individual" because he would pose a "direct threat" if he performed the essential job duties of the Entry Operator position and no reasonable accommodation was available. Doc. 55, p. 18-19. Although it would be improper[33] for OTK to later raise this issue for the first time, in an abundance of caution, the EEOC will briefly address how Burress meets the ADA's definition of "disabled" to demonstrate that the EEOC can prove all elements of its claims.

Anxiety is a disability because it is a mental impairment that substantially limits[34] one or more major life activities including sleeping, thinking, interacting with others and working. *See,* 42 U.S.C. § 12102(1); 42 U.S.C. §12102(2)(A); *see also* 29 C.F.R. § 1630.2(i)(1)(i) (adding to the list, "interacting with others"). These impairments will "virtually always be found to impose a substantial limitation on a major life activity." 29 C.F.R. § 1630.2(j)(3)(ii).[35] OTK does not dispute that Burress

---

discrimination. See *Teamsters v. United States,* 431 U.S. 324, 358 n. 44 (1977); *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 762 (5th Cir. 1996) (trial court applied wrong standard when it considered evidence of pretext where there was direct evidence that employer removed bus driver from duties based on her hearing impairment); *Breaux v. Bollinger Shipyards, LLC*, No. CV 16-2331, 2018 WL 3329059, at *10 (E.D. La. July 5, 2018) (direct evidence of employment decision present where employer concedes firing employee because he did not "wean" himself of Suboxone).

[33] *See, e.g., Essex Ins. Co. v. Foley*, 827 F. Supp.2d 1326, 1330 (S.D. Ala. 2011) ("Essex's election not to advance in its principal brief readily available [legal] arguments ... precludes it from propounding those contentions in its Reply."); *Sharpe v. Global Sec. Int'l*, 766 F. Supp.2d 1272, 1294 n.26 (S.D. Ala. 2011) (improper to consider new argument in reply brief).

[34] The phrase "substantially limits" is to be "construed broadly in terms of extensive coverage" and is "not meant to be a demanding standard." *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1269 (11th Cir. 2014) (citing 29 C.F.R. § 1630.2(j)(1)(i)). A person need only show he is substantially limited from performing a major life activity as compared to the general population. which "usually will not require scientific, medical, or statistical analysis." 29 C.F.R. §§ 1630.2(j)(1)(ii) and (j)(v).

[35] Anxiety is a disability under the ADA. *See, e.g., See also Martin v. Estero Fire Rescue*, 2014 WL 2772339 *3 (M.D. Fla. 2014); *Equal Emp. Opportunity Comm'n v. Phoebe Putney Mem'l Hosp., Inc.,* 488 F. Supp. 3d 1336, 1350 (M.D. Ga. 2020).

20

was diagnosed with anxiety or dispute that it impacted his major life activities. Doc. 55, p. 4; PX 28 ¶ 3.

### 2.    A Reasonable Jury Could Determine that Burress Is a Qualified Individual

A "qualified individual" is someone who, with or without a reasonable accommodation, can perform the essential functions of the job. 42 U.S.C. § 12111(8). *See also, Snead v. Fla. Agricultural & Mechanical Univ. Bd. of Trustees,* 724 Fed. Appx. 842, 844 (11th Cir. 2018). "Essential functions" are "the fundamental job duties of the employment position," but do "not include the marginal functions of the position." *Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1200-01 (11th Cir. 2014) (citing, 29 C.F.R. § 1630.2(n)(1)). "Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Id.* (genuine factual dispute existed as to whether test-driving was an essential function of a technician position). This question is "evaluated on a case-by-case basis by examining a number of factors." *Id*. (quoting, *D'Angelo v. ConAgra Foods, Inc*., 422 F.3d 1220, 1230 (11th Cir. 2005) (internal quotation marks and citation omitted).

### a.   OHC Never Identified Any Essential Functions Burress Could Not Do

OTK mistakenly claims there "is no dispute that the ability to work in a safety-sensitive environment was an essential function of the Entry Operator position Burress sought." Doc. 55, p. 19. The EEOC disputes that working in a particular environment is an essential function. There is no consensus as to what defines a "safety-sensitive" environment.[36] The job description here only mentions "safety-sensitive" under the "qualifications for an ***ideal candidate***." PX 3. Some of these qualifications are "preferred," or "an asset," but none are listed as "essential." *Id.* Specifying these

---

[36] *See, supra*, at p. 11-12. OTK's brief cites general hazards present in the Melt Shop and lists some job tasks such as "basic maintenance" and "operating the caster." Doc. 55, p. 19. It is hard to argue these tasks are essential functions since they are not included in the job description.

qualifications apply to an "ideal candidate," indicates not all are required and thus not essential. Unlike other qualifications, the job description does not characterize "ability to work in a safety-sensitive environment" as a "must." OTK cites no cases finding it is an essential function and provides no evidence under the applicable tests to prove an essential job function. *See,* 29 C.F.R. §§ 1630.2(n)(2) and(n)(3) (essential function factors); *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1258-59 (11th Cir. 2007) (adopting same factors). OTK cannot meet this test because it has not defined what specific tasks or functions are encompassed in "ability to work in safety sensitive environment." Neither did OHC.

OTK has conflated essential job functions (basic duties) with "qualification standards" ("personal and professional attributes' that may include 'physical, medical [and] safety' requirements"). *Toole v. Metal Servs. LLC*, 17 F. Supp. 3d 1161, 1171 (S.D. Ala. 2014) (quoting 29 C.F.R. § 1630.2(q) and *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (*en banc*).[37] Here, OHC applied a qualification standard to determine if Burress could work safely in a hazardous environment, such as the ability to be alert and not drowsy. OHC did not determine whether Burress could perform actual job duties that are essential functions of the job, but rather made assumptions about potential medication side effects impacting his ability to be mentally alert and lumped that under a heading "no safety sensitive duties."

---

[37] Essential job duties are not expressed as vague, catch-all phrases like "ability to work in safety sensitive environment." *See, e.g., McDonald v. Town of Brookline*, No. 12-10824-RWZ, 2015 U.S. Dist. LEXIS 197082, at *16 (D. Mass. Mar. 30, 2015) ("[s]trenuous physical effort" is a vague concept, open to a wide range of interpretations which a reasonable jury could apply to only a small fraction of the work.); *Jones v. Blue Cross Blue Shield of La.*, No. 16-340-JWD-RLB, 2018 U.S. Dist. LEXIS 13544, at *20 (M.D. La. Jan. 29, 2018) (summary judgment improper where evidence of essential job duties was "ambiguous and sometimes vague").

### b.    Burress's Track Record Shows He Could Perform All the Essential Functions

Regardless of whether working in a safety sensitive environment is an essential function,[38] Burress's track record of safely working in similar hazardous jobs demonstrates he was qualified for the position. OTK cites no facts showing Burress actually posed any threat to workplace safety based on taking Xanax. The record, in fact, shows the opposite.  Danielson did not check the box indicating she considered Burress a direct threat. PX 7, p. 27. Dr. Swotinsky testified he was not a direct threat. PX 40, 231:23-233:5. Dr. Edwards cleared him in January 2018 to drive a dump truck and noted during the same week OTK rescinded Burress's job that he had been stable taking Xanax. PX 6, p. 7; Edwards Dec. ¶ 10, 15. Dr. Edwards testified Burress never reported any lingering side effects at work after taking Xanax outside of work hours that prevented him from safely doing his normal work activities. Edwards Dec. ¶ 6, 7, 14. Defendant, Danielson, and Dr. Taylor all agree that Xanax does not affect everyone the same and Pfizer's warning about Xanax does not warn against operating heavy machinery unless Xanax actually causes an individual to have certain side effects. PX 38, 156:17-158:21; PX 9, p. 9; PX 41, 73:21-74:1, 77:13-80:21, 94:23-96:13; PX 34, 99:21-101:13.

The Eleventh Circuit has held that summary judgment is not warranted where (like here) there are conflicting medical opinions between an applicant's personal physician and the employer's pre-employment physical provider regarding whether he can perform the job without representing a direct threat to himself. *Pinckney v. Potter*, 186 F. App'x 919, 926 (11th Cir. 2006)*; see also, Nevitt v. United States Steel Corp.,* 18 F. Supp. 3d 1322, 1334 (N.D. Ala. 2014) (summary judgment not appropriate when determining whether plaintiff posed a direct threat hinges on an assessment of his

---

[38]Where, as here, it is disputed whether a function is an essential function, the Court cannot determine that Burress is a direct threat. *See, Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (cannot determine employee is a direct threat where there is a disputed fact on what her essential job functions are).

23

credibility and the weighing of the conflicting medical evidence); *Cooper v. Walker Cty. E-911*, No. 6:16-CV-1746-TMP, 2018 WL 3585217, at *11 (N.D. Ala. July 26, 2018) (disabled employee who had actually performed in the desired position was qualified individual); *Breaux v. Bollinger Shipyards, LLC*, No. CV 16-2331, 2018 WL 3329059, at *10-11 (E.D. La. July 5, 2018) (Welder in "safety-sensitive" position could perform the essential functions despite taking "safety sensitive" drug that employer argued may have impacted his mental acuity, Suboxone).[39]

### 3. OTK Rescinded Burress's Offer Based on His Anxiety Disability

OTK asserts that Danielson did not clear Burress because he was unable to perform safety sensitive duties but that is not the full picture. Doc. 55, p. 4 ¶ 19, p. 20. The record is clear that Danielson did not clear Burress because he took Xanax. *See, supra,* p. 6-7. Xanax was the only basis for OTK not hiring Burress and it would have hired Burress if Danielson cleared him based on no longer taking Xanax. *See, supra,* p. 9. Thus, the true reason for rescinding Burress's job was OHC's recommendation that Burress needed the "accommodation" of "no safety sensitive duties" based on Danielson's *only* "abnormal finding" that "Patient is taking Xanax prn" PX 7, p. 12, 27.

By refusing to hire Burress based on his disability-related medication, OTK discriminated against him based on his disability. Because medications are prescribed for impairments, adverse action taken because of medication is necessarily acting based on impairments. *See also, Pollard v.*

---

[39] *See also, Pollard v. Drummond Co., Inc.*, No. 2:12-CV-03948-MHH, 2015 WL 5306084, at *7 (N.D. Ala. Sept. 10, 2015) (disputed material fact that plaintiff could perform essential function of position when he had worked at other positions for employer); *Williams v. Anheuser-Busch, Inc.*, 957 F. Supp. 1246, 1250 (M.D. Fla. 1997) (qualified individual who worked for defendant 4 years with no safety incident); *Lee v. Harrah's New Orleans*, No. CIV.A. 11-570, 2013 WL 3899895, at *5 (E.D. La. July 29, 2013) (evidence plaintiff worked in position for six months created genuine issue of material fact whether she could fulfill the essential functions of the position); *Equal Emp. Opportunity Comm'n v. M.G.H. Fam. Health Ctr.*, 230 F. Supp. 3d 796, 815 (W.D. Mich. 2017) (disabled individual qualified based on working for five weeks in position); *Gallups v. City of Alexander City*, 287 F. Supp. 2d 1286, 1299–300 (M.D. Ala. 2003) (employee's review stating he "essentially meets the job requirements" can mean "able to perform essential functions" even if those terms do not equate).

*Drummond Co., Inc.*, No. 2:12-CV-03948-MHH, 2015 WL 5306084, at *7 (N.D. Ala. Sept. 10, 2015) (finding issue of material fact whether employer discriminated against plaintiff by terminating him because of his use of medication for back pain); *Rigby v. Springs Indus.*, No. 1:03-CV-0637-VEH, 2006 U.S. Dist. LEXIS 101963, at *19 (N.D. Ala. May 5, 2006) (finding issue of material fact whether employee's use of medication presented a direct threat); *Haynes v. City of Montgomery, Ala.*, 344 F. App'x 519, 520 (11th Cir. 2009) (holding that plaintiff presented sufficient evidence that employer discriminated against him based on perceived performance limitations from use of prescription medications); *Howard v. Norfolk S. Corp.*, No. 2:17-CV-02163-RDP, 2020 WL 5569922, at *16 (N.D. Ala. Sept. 17, 2020) (finding genuine issue of material fact whether placing plaintiff on medical hold because of his use of medication was for a legitimate, nondiscriminatory reason).[40]

### C.    Buress Did Not Pose a Direct Threat

OTK has not proven Burress is a direct threat because OTK (or its agent OHC[41]) never obtained basic information to establish that Burress's Xanax use posed a significant risk of substantial harm. OTK relied on mistaken assumptions about the Pfizer drug warning rather than a fact-based judgment supported by the most current or best available medical knowledge or objective evidence. "Direct threat" means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation. 42 U.S.C.A. § 12111. It must pose a "***significant risk, i.e., high***

---

[40] *See also, Breaux v. Bollinger Shipyards, LLC*, No. CV 16-2331, 2018 WL 3329059, at *14 (E.D. La. July 5, 2018) ("The disability alleged here is not just Plaintiff's opioid dependency, but the fact that he must take certain medications, namely Suboxone, to manage the condition."); *Huffman v. Turner Indus. Grp., L.L.C.*, No. CIV.A. 12-1061, 2013 WL 2244205 at *16 (E.D. La. May 21, 2013) (disability was not just Plaintiff's impaired hand, but Plaintiff's need to take certain medications to manage the pain and anxiety caused by his impaired hand).

[41] The definition of an "employer" includes "any agent" of the employer. 42 U.S.C. § 12111(5)(A). A person is an agent of an employer if he participated in the decision-making process that forms the basis of the discrimination. 42 U.S.C. § 12112(b)(2); *Hamilton v. Rodgers*, 791 F.2d 439, 443 (5th Cir. 1986) (discussing agency in the context of Title VII liability).

*probability, of substantial harm; a speculative or remote risk is insufficient*." [42] 29 C.F.R. §

1630.2(r) App. (emphasis added). *See also, Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) ("Because

few, if any, activities in life are risk free, *Arline* and the ADA do not ask whether a risk exists, but

whether it is significant.").

A direct threat assessment "must also be 'based on a reasonable medical judgment that relies

on the most current medical knowledge and/or the best available objective evidence,' and upon an

expressly 'individualized assessment of the individual's present ability to safely perform the essential

functions of the job,' reached after considering, among other things, the imminence of the risk and

the severity of the harm portended." *Chevron USA, Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting

29 C.F.R. § 1630.2(r)). As echoed in OTK's ADA training for managers (PX 23, p. 42), factors to be

considered include the severity, likelihood, imminence and duration of the risk of the potential harm.

29 C.F.R. § 1630.2. OTK undertook none of these inquiries.

Danielson made her assessment of Burress known from the minute she entered the exam room,

"Oh I remember you; you take Xanax." She then relied solely on her misunderstanding of the Pfizer

drug warnings and possible side effects. PX 30; PX 32, 172:15-173:4. Direct threat analysis requires

more than such generalizations and stereotypes. In *Keith v. Cty. of Oakland*, 703 F.3d 918, 923–24

(6th Cir. 2013), the Sixth Circuit affirmed the district court's determination that a doctor failed to

make an individualized inquiry when, upon entering the exam room and briefly reviewing the

plaintiff's file, he declared, "He's deaf; he can't be a lifeguard." *Id.* "Dr. Work made no effort to

---

[42] This determination cannot be based "on stereotypic or patronizing assumptions." 29 C.F.R. §
1630.2(r). "Generalized fears about risks from the employment environment . . . cannot be used by
an employer to disqualify an individual with a disability." *E.E.O.C. v. Dolphin Cruise Line, Inc.*, 945
F. Supp. 1550, 1555 (S.D. Fla. 1996) (quoting 29 C.F.R. § 1630.2(r) (latest medical knowledge did
not support employer's contention that HIV-positive cruise employee was a direct threat because he
"could" transmit the HIV virus to others)).

determine whether, despite his deafness, Keith could nonetheless perform the essential functions of the position, either with or without reasonable accommodation." *Id.* at 924.

Courts in the Eleventh Circuit agree that employer decisions based on stereotypical qualifications standards about medications are discriminatory. *See, Lowe v. Alabama Power Company*, 244 F.3d 1305, 1308 (11th Cir. 2001) ("To prevent the very reliance on stereotype and related perceptions of an individual's limitations that the ADA prohibits, an employer must point to particularized facts about the specific person's condition to support its decision."); *Pollard v. Drummond Co.,* No. 2:12-cv-03948-MHH, 2015 WL 5306084, at *6 (N.D. Ala. Sept. 10, 2015) (Company doctor's opinion based on "his experience with other methadone patients, his knowledge of methadone's potential side effects, and his ***general belief*** that any mine employee taking methadone should be placed on restriction" is insufficient) (emphasis added); *Howard v. Norfolk S. Corp*., No. 2:17-CV-02163-RDP, 2020 WL 5569922, at *15 (N.D. Ala. Sept. 17, 2020) ("an employer's determination that an employee's use of medication violated certain guidelines, without more, does not amount to the "individualized inquiry into [the employee's] present ability to perform his job functions" required to determine that an employee constitutes a direct threat.") (internal citations omitted).

OTK's flawed determination about Burress closely resembles that which the Eleventh Circuit found failed to show direct threat in *Haynes v. City of Montgomery*, No. 2:06-CV-1093-WKW, 2008 U.S. Dist. LEXIS 79992, at *14 (M.D. Ala. Oct. 6, 2008) (affirmed, 344 F. App'x 519 (11th Cir. 2009)). In *Haynes,* the court found no direct threat where the employer's doctor only knew about possible side effects of anxiety medication listed in general prescription information, was unaware of any medical studies about the side effects and the doctor admitted that side effects vary from person to person. *Id.* at 14-15. And, the doctor did no further testing on Mr. Haynes nor attempted to discuss Mr. Haynes's possible side effects with the treating psychiatrist. *Id.* Unlike in *Bosarge v. Mobile Area*

27

*Water & Sewer Serv.*, No. 20-14298, 2022 U.S. App. LEXIS 2046, at \*24 (11th Cir. Jan. 24, 2022), Burress's doctor had not informed OTK that he had actual side effects that would impact his ability to do any essential job function. Assumptions or general beliefs regarding potential drug side effects are insufficient to demonstrate a direct threat.[43]

OHC never asked for basic information about his use of Xanax including how often he used it, whether he used it at work, or took it within a certain number of hours of work, or actually experienced any of the potential side effects, or ever experienced any side effects at work that would affect his ability to be alert and awake. *See, supra*, at p. 7-9. OHC acknowledged it would have been relevant to confirm whether he did and agreed that according to Pfizer some individuals can safely operate heavy equipment while taking Xanax. *See, supra*, p. 15-16. OTK and OHC also did not have nor utilize the most current or best available medical knowledge or objective evidence as required. OTK, its Melt Shop manager, and Safety Director could not cite to any medical, scientific, steel industry or anecdotal evidence that Xanax use was causally linked to any safety incidents or injuries. OTK relied solely on OHC's recommendation. OHC relied on Danielson's erroneous understanding of the Pfizer drug warning and casual approach to disqualifying Burress based only on him taking Xanax regardless of whether it affected him at work. Danielson never bothered to learn that Burress

---

[43] *Hixon v. Tennessee Valley Auth. Bd. of Directors*, 504 F. Supp. 3d 851, 864 (E.D. Tenn. 2020) (denying summary judgment where employer relied upon conclusion employee "*might* have bad side effects, but there was no evidence as to whether any of these side effects occurred" because no one "inquired if Plaintiff had suffered from any side effects."); *Breaux v. Bollinger Shipyards, LLC,* No. 16-2331, 2018 WL 3329059 at \*13 (E.D. La. July 5, 2018) (denying summary judgment to OTK because while the plaintiff took a potentially dangerous drug, there was no evidence as to whether plaintiff actually experienced debilitating side effects); *EEOC v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 517–18 (W.D. Pa. 2010) (holding an individualized inquiry was still necessary when an employee admitted to using methadone); *Wysong v. The Dow Chemical Company*, 503 F.3d 441 (6th Cir. 2007) (jury could conclude employer perceived employee as disabled by refusing to release her to return to work due to concerns about safety risks in taking narcotic drugs while working on machine and forklift).

did not take Xanax during work hours, and that he had none of the potential side effects she thought may cause a risk.

OTK argues Dr. Edwards and Danielson could "reasonably disagree" (Doc. 55, p. 22), but that gives Danielson too much credit because she lacked any facts (other than the name of the medication) on which to reasonably base any medical judgment. The only facts in the record regarding Burress's use of Xanax are that he only took it at bedtime, never took it close in time to work, never experienced side effects from Xanax at work, and stopped taking it completely when OTK used it as a basis not to hire him. And, as discussed, *supra* p. 22-24, there is a basis to find Burress was not a direct threat based on his track record of safely performing similarly hazardous work.

Without evidence that OTK made a particularized assessment of Burress's actual ability to do the job while taking Xanax at night (if at all), it attempts to rely on the recommendation of OHC. However, an employer's reliance on a doctor is not a defense. *See Pollard v. Drummond Co., Inc.,* No. 2:12-CV-03948-MHH, 2015 WL 5306084, at *7 (N.D. Ala. Sept. 10, 2015) ("An employer may not rely upon the recommendation of a physician who . . . conducts a cursory examination and bases his opinion at least in part on a general assumption that all patients with the same disability have the same limitations."); *Lowe*, 244 F.3d at 1309 (denying summary judgment where doctor's restrictions not based on actual capabilities but rather assumptions that all double amputees have the same

29

limitations).[44] Likewise, OTK also cannot rely on a "good faith" defense.[45] For the same reasons OTK has not proven a direct threat defense, it cannot prove its qualification standard was based on business necessity.[46]

### D.    The Parties Dispute Whether OTK Could Have Accommodated Burress or Even Needed To

OTK's assertion that it had no obligation to consider an accommodation because Burress never proposed one lacks merit.[47] (Doc. 55, p. 25). OTK's refusal to communicate with Burress after

---

[44] *See also Holiday v. City of Chattanooga*, 206 F.3d 637, 644-45 (6th Cir. 2000) (stating, among other things, that **"[c]ourts need not defer to an individual doctor's opinion that is neither based on the individualized inquiry mandated by the ADA nor supported by objective scientific and medical evidence"**) (emphasis added). *E.E.O.C. v. Browning - Ferris, Inc*., 262 F.Supp.2d 577 (D. Md. 2002) (reasonable jury could find employer violated ADA by relying exclusively on company doctor's opinion which was not based on most current medical knowledge or best available objective evidence); *EEOC v. MGH Family Health Center,* No. 1:15-cv-952, 2017 WL 410298 at *14-17 (W.D. Mich. Jan. 30, 2017) (when direct evidence shows that the employer rejected an applicant because of an actual or perceived disability without first performing an individualized inquiry, the employer is statutorily estopped from arguing that the person was not "otherwise qualified.") *Taylor v. Pathmark Stores, Inc*., 177 F.3d 180, 193 (3d Cir. 1999) (no reasonable mistake defense).

[45] An employer misjudges the objective evidence at its own peril. *See Bragdon*, 524 U.S. at 649-50 (1998) (employer's "belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability . . . courts should assess the objective reasonableness of the [employer's] views"); *Lowe v. Alabama Power Company*, 244 F.3d 1305, 1309 (11th Cir. 2001) (in denying summary judgment, stating that "Alabama Power's decision that Lowe was not able to perform the mechanic position safely was not based, therefore, on particularized facts using the best available objective evidence as required by the regulations).

[46] A business necessity defense fails here for the same reasons the direct threat defense fails: OTK has not demonstrated how Burress taking Xanax posed a high probability of substantial harm. "In evaluating whether the risks addressed by a safety-based qualification standard constitute a business necessity, courts consider the magnitude of possible harm as well as the probability of occurrence. The focus of the inquiry is whether the risks are real or simply the product of stereotypical assumptions." *See Fuzy v. S & B Eng'rs & Constructors, Ltd*., 332 F.3d 301, 303 (5th Cir. 2003). Perhaps recognizing it has not and cannot prove this affirmative defense, OTK makes only a passing reference to it in its Brief (Doc. 55, pp. 18-19), likely waiving it.

[47] OTK wrongly contends that to accommodate him would risk Burress having a panic attack at work. Panic attacks were not a factor in OTK's decision to rescind Burress's job, so they are not a basis to dispute whether OTK considered accommodating him. OHC did not have any information about Burress having any such episodes such as frequency, when they occurred, what triggered them, if they happened at work, how long since the last one, etc. If OHC had asked, Burress could have explained that his last episode that could be considered a panic or anxiety attack occurred three years prior to his job offer from OTK. And, OTK had no knowledge of Burress having a panic attack when

rescinding his job foreclosed Burress's ability to discuss a reasonable accommodation with OTK. No "magic words or talismanic language are needed." *Williamson v. Clarke Cty. Dep't of Human Res.*, 834 F. Supp. 2d 1310, 1320 n14 (S.D. Ala. 2011) (internal citations omitted).[48]

Even if the burden to show an accommodation is reasonable rests with the applicant, the employer cannot escape its duty to reasonably accommodate by refusing to enter into the interactive process or require the applicant use magic words such as, "I am calling/texting/emailing to propose a reasonable accommodation." In addition to calls and text messages, Burress contacted Rodrigues in writing twice to request she send him the decision to rescind his offer in writing (all of which she ignored). *See, supra*, at 8. Burress was trying to understand the basis for his job being rescinded, explain why Xanax did not keep him from working in a hazardous environment, and that he no longer took it. PX 32, 189:6-18; PX 28 ¶¶ 10, 12. Rodrigues knew about Burress's disability-related medication and did not attempt to engage with him in the interactive process. She knew Burress was trying to contact her to see what he could do in order for OHC to change its position and if OTK would reconsider rescinding his job, and admits that she had a "responsibility" to engage with anyone OHC identified had a medical restriction to "see if there is any accommodation that can be met." *See, supra*, p. 9.

---

it rescinded his job. The only place the word "panic" appears in the OHC records is in a letter from Dr. Edwards dated September 6, 2018, which is after September 4, 2018, when OTK received OHC's records. In addition, had OHC or OTK followed up with Dr. Edwards to obtain medical records or have a conversation, it would have been clear that his September 6th reference to "panic disorder" was a mistake because he prescribed Xanax for anxiety, not panic attacks. PX 1 Edwards Dec. ¶ 13.

[48] Under the ADA, where an employee's notice to an employer of disability is ambiguous as to the precise nature of the disability or desired accommodation but is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005). *See, Colwell v. Rite Aid Corp.*, 602 F.3d 495, 507 (3d Cir. 2010) ("if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help" and may need to meet him "half way").

OTK's notice of Burress's disability triggered its responsibility to "initiate an informal, interactive process" to identify the person's limitations and potential reasonable accommodations that could overcome those limitations. *Spears v. Creel*, 607 F. App'x 943, 948 (11th Cir. 2015) (*quoting* 29 C.F.R. § 1630.2(o)(2)(ii)). By failing to engage in the interactive process, OTK cannot prevail at summary judgment on a reasonable accommodation claim. *See, Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000); *Crutcher v. Mobile Hous. Bd.*, No. CIV.A. 04-0499-WS-M, 2005 WL 2675207, at *12 (S.D. Ala. Oct. 20, 2005). "[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Lowe v. Delta Airlines, Inc.,* No. 1:16-CV-3717-TWT-JSA, 2017 WL 2982336, at *9 (N.D. Ga. May 31, 2017), *aff'd sub nom. Lowe v. Delta Air Lines Inc.*, 730 F. App'x 724 (11th Cir. 2018)) (other citation omitted).

Had Rodrigues not ignored Burress, they would have reached an understanding that permitted Burress to be cleared by OHC and start work. Burress could have done the Melt Shop job safely without accommodation, either because OHC would have learned that his actual use of Xanax did not interfere with his ability to do safety sensitive work, or because by the time they spoke he would no longer be taking Xanax. Such a conversation about stopping medication would not be unprecedented. *See Breaux v. Bollinger Shipyards, LLC*, No. CV 16-2331, 2018 WL 3329059, at *15 (E.D. La. July 5, 2018) (genuine issue of fact whether plaintiff's requested accommodation of being able to continue using Suboxone was reasonable or some other accommodation could have been made for his disability). Alternatively, Burress could have agreed to only take Xanax at bedtime (which he already was doing) and OTK could have permitted Burress to work while taking Xanax as all his other employers did. *See, Woodruff v. Ohio DOT*, No. 1:18-cv-853, 2021 U.S. Dist. LEXIS 68878, at *41 (S.D. Ohio Apr. 9, 2021) (genuine issue of material fact existed whether plaintiff requested the accommodation of being permitted to continue working on his current medication regimen or

32

continue working while agreeing to take medication only at night).[49]

### E.    OTK's Alleged "After-Acquired Evidence" Is No Defense

Evidence of employee misconduct acquired after an adverse employment action may limit certain forms of damages. *McKennon v. Nashville Banner Pub. Co*., 513 U.S. 352, 354 (1995). This rule does not apply here because Burress did not engage in any misconduct, certainly none that was so grave that immediate discharge would have followed its disclosure.[50] *See, Wallace v. Dunn Const. Co*., 62 F.3d 374, 379 (11th Cir. 1995) (citing *McKennon,* 513 U.S. at 356). Damages may not be limited simply "because the employer could have terminated an employee for any lawful reason." *Holland v. Gee*, 677 F.3d 1047, 1065 (11th Cir. 2012). OTK's bases for asserting this defense do not meet the test. Burress was forthright in his PPE by disclosing his prescription for Xanax. An episode of drowsiness outside of work and an anxiety attack three years before his application to OTK is not damages-limiting misconduct; in fact, it is not misconduct at all.[51]

---

[49] OTK has not met its burden to prove any proposed accommodation imposes an undue hardship. *See Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir.1998). OTK wrongly asserts that the accommodation EEOC has proposed is the elimination of the safety sensitive portion of the job. Doc. 55, p. 26. Burress was fully capable of performing the job without any accommodation. An undue hardship is defined as "significant difficulty or expense incurred by a covered entity." *Robinson v. Rock Tenn CP, LLC*, 986 F. Supp. 2d 1287, 1310 (N.D. Ala. 2013) (*citing* 29 C.F.R. 1630.2(p) and *Holbrook v. City of Alpharetta, Ga.,*112 F.3d 1522, 1526 (11th Cir. 1997)). OTK has not demonstrated how any proposed accommodation would require "significant difficulty or expense" under 42 U.S.C.A. § 12111 (10), such as by showing the cost of the accommodation, its own financial resources, or the effect of the accommodation on expenses and resources. None of the above proposed accommodations would have cost OTK anything.

[50] All after-acquired evidence cases OTK cites involve misconduct such as illegal use of drugs and falsifying an employment application. Burress never did anything to trigger termination.

[51] There is no way to know if OHC would have restricted his work duties due to being sleepy outside of work or for a single panic attack three years earlier because OHC never questioned Burress about sleepiness outside work or panic attacks. Dr. Edwards and Dr. Swotinsky were both aware of his October 30, 2018 email to Dr. Edwards and his 2015 panic attack and believed this did not justify disqualifying him. OTK has not established any wrongdoing as undisputed fact in order to invoke the after-acquired evidence doctrine, and certainly has not established as a matter of law that it would have failed to hire Burress if it had known of these facts as it now claims. Thus, OTK is not entitled to a limit on backpay as it claims.

**F.    OTK's Basis to Rescind Burress's Job Was a Pretext for Disability Discrimination**

As argued previously, the prevailing law in cases involving disqualification for possible side effects for use of disability-related medication provides that such action violates the ADA where, as here, it is not based on an individualized assessment of the plaintiff's present ability to do the job, but instead on assumption or speculation about possible side effects. *See* pages 25-28, *supra*. Courts do not apply the *McDonnell Douglas* pretext analysis because none is necessary. *See* note 32, *supra*.

OTK claims, "There is no evidence that anyone at OTK treated Burress less favorably than any other applicant based on knowledge of any alleged disability." Doc. 55, p. 23. However, the EEOC was not permitted to discover evidence of comparators. The EEOC subpoenaed information from OHC regarding PPEs of other applicants who took Xanax or similar medication but was denied access to this information when the Court required the EEOC to modify its subpoena in response to OTK's Motion to Quash or Motion for Protective Order Docs. 26 and 30. The EEOC followed this Court's order limiting our discovery pertaining to this type of information. Therefore, the lack of comparator evidence should not be used against the EEOC by allowing OTK to make claims not supported by the record.

Contrary to Defendant's argument (Doc. 55, p.23), mistake, lack of intent to discriminate, or good faith is not a defense. *See* notes 43, 44, and 45, *supra*. Additionally, such evil intent is not a necessary element under Count 3 of the EEOC's Complaint alleging a violation of 42 U.S.C § 12112(b)(3) and (b)(6) because OTK can be liable for a qualification standard that tends to screen out applicants taking disability-related medications regardless of motive or intent unless it can prove the probability of harm required for business necessity as discussed above, which it has not done.

Furthermore, OTK's reliance on *Goff v. Performance Contrs., Inc.,* 2020 WL 1794967 (S.D. Ala. April 8, 2020 and *Daw v. G.A.W. & Co.*, 2021 WL 6052800 (S.D. Ala. April 20, 2021) to argue

34

it had a legitimate non-discriminatory reason to rescind Burress's offer is misplaced because those cases are not analogous. In *Goff* and *Daw*, occupational medicine providers based their opinions on more than just general drug warnings of potential side effects and neither employer alleged that the medication at issue caused a direct threat. The PPE providers in those cases relied on the most current medical knowledge and/or the best available objective evidence including an on-point peer reviewed occupational medicine journal article about the opioids one applicant took, medical records from an applicant's treating physician, current reports of an applicant's continued "severe" and debilitating pain, an applicant's documented history of dependence on the opioid, and one applicant's documented history of abuse and lying about taking medication. Also, the applicants in both cases had documented back and/or mobility problems that required them to take pain medication multiple times daily (not just to sleep) and rendered them physically incapable of lifting the required amount that was indisputably an essential job function.[52] No one has disputed Burress's ability to perform the physical

---

[52] Danielson performed the PPE at issue in *Daw* and (unlike here) she actually reviewed Daw's records from his treating physician. *Daw,* at * 3. She noted that he had degenerative disc disease, reported "severe" back pain to a physical therapist two weeks before his PPE, took several medications that affected his mental alertness, and had a history of abusing pain medication. *Id.* The job requirements were clearly stated and included the ability to lift 100 pounds and full range of cervical spine movements, but Daw could only lift "very light weights." *Id.* at *2-3. Danielson's recommendation for a lifting restriction was based on "an individualized assessment of Daw, including an independent medical examination, medical records from Daw's treating physician, interpretation of Daw's medical condition, familiarity with the job duties of an equipment operator, and science concerning morbid obesity and degenerative disc disease" as well as positive drug reports after he claimed he was no longer taking the medications. *Id.* at *3. Furthermore, the employer's Safety Director discussed the evaluation with Dr. Taylor before rescinding the job offer based on the applicant being limited to lifting 40 pounds, far less than the required amount. Thereafter, Daw continued to have back problems and take the problematic medications. Burress had no physical limitations, did not abuse or lie about how much Xanax he took and neither OHC or OTK's safety director considered Burress individually, reviewed his treating physician's medical records, or "science" about his medication or condition.

In *Goff*, the court held that no reasonable fact finder could determine Goff was disabled under the ADA and he was not a "qualified" individual **because he could not lift the required number of pounds**. *Goff* at *7-8. That alone was a basis to grant summary judgment which is not applicable here because OTK has not disputed that Burress is disabled and contends Burress is not a qualified

duties of the Melt Shop position.

OHC's PPE results, which lack any objective medical basis, coupled with OTK's failure to conduct any kind of actual risk analysis, reveal OTK's stated reason to be a pretext. Summary judgment is not proper when disputes exist regarding whether the medical reason the employer provided was a legitimate, non-discriminatory reason. *Howard v. Norfolk S. Corp.*, No. 2:17-CV-02163-RDP, 2020 WL 5569922, at *16 (N.D. Ala. Sept. 17, 2020) (finding genuine issue of material fact whether placing plaintiff on medical hold and disqualifying him from all safety sensitive jobs solely due to his use of medications was for a legitimate, nondiscriminatory reason). OTK cannot claim a legitimate, nondiscriminatory reason when it automatically endorsed an objectively baseless determination by OHC. "An employer cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions. The employer has an obligation to ensure that its applicants are treated as individuals." *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 484 (5th Cir. 2006).[53] Based on OHC's reasoning, applicants who take any

---

individual based on a direct threat argument due to possible medication side effects and not a physical inability to do an essential job function. Unlike Burress, Goff took an opioid pain medication three times daily for 20 years. *Id.* at *2. The doctor performing Goff's PPE recommended "safety-sensitive restrictions" because of his long term use of opioids and relied on "authoritative guidelines" published by the American College of Occupational and Environmental Medicine (ACOEM). *Id.* at *3. The ACOEM guidelines do not apply to Xanax which is not an opioid. PX 11, p. 6-7. In addition, Danielson did not consult or rely upon this article or any other ACOEM published recommendation in this case. PX 38, 155:6-18. She only relied on her mistaken understanding of the Pfizer drug insert. And, unlike OTK, the employer actually tried to accommodate Goff. *Id.* at 10. OHC did not rely on similar current medical or best available objective evidence in disqualifying Burress.

[53] *See Holiday v. City of Chattanooga*, 206 F.3d 637, 647 (6th Cir. 2000) (OTK's proffered reason was pretextual because "the absence of any objective medical and scientific support for Dr. Dowlen's opinion casts doubt on the City's purported reliance on the physician's report."); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 32 (1st Cir. 2002) (finding that employer's reliance on its physician was not a legitimate, nondiscriminatory reason warranting summary judgment when a jury could find that the physician's opinion was unsupported); *Equal Emp. Opportunity Comm'n v. M.G.H. Fam. Health Ctr.*, 230 F. Supp. 3d 796, 810 (W.D. Mich. 2017) (OTK could not claim no responsibility for a recommendation it adopted, otherwise "all employers could simply contract out disability determinations to a third-party medical provider and simply be immune once they 'mechanically rel[ied] on the medical opinions and advice of third parties,' even if the medical

of the nearly 10,000 common over-the-counter or prescription medication with a warning about operating a car or machinery could be excluded from jobs even if they do not experience side effects. PX 11, p. 5-6. Excluding qualified applicants for jobs based on hypothetical and speculative risk about what ***could*** happen or ***might*** occur is not permitted under the ADA.

## V.    Conclusion

Summary judgment is not merited because a reasonable jury can determine OHC and OTK never obtained or considered current medical or the best available objective evidence required to conduct an individualized assessment of whether Burress actually posed a substantial risk and OTK refused to discuss potential accommodations. OTK violated the ADA by relying on OHC's misinformed and knee-jerk assumptions about possible side effects without verifying Burress actually experienced them at work and by ignoring Burress's attempts to inform OTK what OHC neglected to learn about how he could safely perform all essential job functions and that any possible risk was eliminated because he had discontinued taking Xanax.

---

opinions were objectively unreasonable[.]'" (quoting *Keith v. Cty. of Oakland*, 703 F.3d 918, 923–24 (6th Cir. 2013) and citing *Holiday*, 206 F.3d at 645)).

**Respectfully Submitted**

**MARSHA L. RUCKER**
Regional Attorney
PA Bar No. 90041

**GERALD MILLER**
Supervisory Trial Attorney
AL Bar No. 1454-E526

*/s/ Gina Pearson*
**GINA PEARSON**
Trial attorney
AL Bar No. ASB-3971-H61G
gina.pearson@eeoc.gov
(205) 651-7049

**CARL CHANG**
Trial Attorney
AL Bar No. ASB-8768O14P
carl.chang@eeoc.gov
(205) 651-7056

Equal Employment Opportunity Commission
Birmingham District Office
Ridge Park Place, Suite 2000
1130 22nd Street South
Birmingham, AL 35205
Tel. (205) 651-7049
Fax. (205) 212-2041

## **CERTIFICATE OF SERVICE**

I, Gina Pearson, hereby certify that on February 18, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing systems to all parties indicated on the electronic filing receipt.

> Devin Clark Dolive
> Burr & Forman, LLP
> 420 North 20th Street, Suite 3400
> Birmingham, AL  35203
> ddolive@burr.com
>
> Kathryn M. Willis
> Burr & Forman, LLP
> Post Office Box 2287
> Mobile, AL  36652
> kwillis@burr.com

> */s/ Gina Pearson*
> **GINA PEARSON**