## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

EQUAL EMPLOYMENT　　　　　 )
OPPORTUNITY COMMISSION,　　 )
　　　　　　　　　　　　　　　 )
　　　　Plaintiff,　　　　　　　 )
　　　　　　　　　　　　　　　 )
vs.　　　　　　　　　　　　　　 )　 **CIVIL ACTION NO. 20-521-CG-B**
　　　　　　　　　　　　　　　 )
OUTOKUMPU STAINLESS USA,　 )
LLC,　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　 )
　　　　Defendant.　　　　　　　

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the court on Defendant, Outokumpu Stainless USA,

LLC's ("OTK") motion for summary judgment (Doc. 54), Plaintiff, Equal

Employment Opportunity Commission's ("EEOC") opposition thereto (Doc. 64), and

Defendant's reply (Doc. 66). For the reasons explained below, the Court finds that

Defendants' motion for summary judgment should be DENIED.

## FACTS

OTK manufactures stainless steel at its Calvert, Alabama facility where it

employs approximately 900 team members. (Doc. 56-5 at 2; PageID.572).[1]  At all

relevant times, OTK has had in place an Equal Employment Opportunity policy,

---

[1] At all times relevant to this litigation (August and September 2018), Marva Rodrigues worked in Human Resources as a Team Member Relations Representative; Thomas Hayden worked as Team Manager of LTS/CCM/SGP in the Melt Shop until late August 2018, when Stephen Pittman assumed the role; Wayne Denton worked as Director of Environmental, Health and Safety; and Michael Nations worked as Shift Coordinator in the Caster and Ladle Treatment areas. (Doc. 56-3, 56-4, 56-5, Doc. 56-13 at 3; PageID.763, Doc. 56-17 at 3-4; PageID.831-32).

1

which prohibits any form of discrimination, including, but not limited to, disability discrimination. (Doc. 56-4; Doc. 56-5). OTK has also had in place an Americans with Disabilities Act ("ADA") policy, which provides that reasonable accommodations will be provided to qualified individuals with disabilities. (Doc 56-5 at 14; PageID.584). Managers and Human Resources are provided training on the ADA policy, with managers understanding that any medical issues or potential requests for accommodation must be directed to Human Resources for handling. (Doc. 56-4 at 3; PageID.557; Doc. 56-5 at 3; PageID.573; Doc. 56-16 at 6; PageID.814; Doc. 56-13 at 4-5; PageID.764-64). During 2018 and 2019, OTK also had in place a Substance Abuse Policy, which, in part, required active Team Members to report prescription medications that may interfere with their ability to safely perform their job duties. (Doc. 56-5 at 4; PageID.574; Doc. 56-7 at 16; PageID.626).

**Jared Burress**

Since 2011, Burress has worked in industrial settings. (Doc. 63-28 at 5-8; PageID.1109-12). Burress is a certified forklift driver and Senior Crane Operator with experience using several types of cranes, plasma cutting machines, track torches, powered industrial vehicles (such as Bobcats, all terrain forklifts and material handlers), and other industrial power tools and equipment. (Doc. 63-28 at 5-8; PageID.1109-12). From 2011 to 2016, Burress worked for SSAB as an Entry Level Maintenance Operator and qualified Maintenance Operator in the metal casting department and on Quench Lines. (*Id.*) SSAB manufactures carbon steel.

2

(Doc. 63-33 at 68-69; PageID.1196-97).   SSAB's casting department uses a process to convert scrap metal into molten steel similar to OTK to manufacture steel and has similar work environments. (Doc. 63-35 at 7-9, 12-13; PageID.1386-881, 1391-92). Burress' employment at SSAB was not primarily working around molten steel but he performed limited work in the casting department from time to time.  (Doc. 63-32 at 28- 30; PageID. 1156-58). Burress has worked (without incident) around continuous hazards with the potential to cause serious injury or death which required him to be always alert, aware of his surroundings and able to immediately react to any hazardous situation. Doc. 63-28 at 7; PageID.1111).  He has never been terminated, disciplined for any safety issue, or involved in any workplace safety incident. (Doc. 63-28 at 7; PageID.1111).  All of Burress's employers were aware that he had a prescription for Xanax and let him work without restriction. (*Id*. at 8; PageID.1112). None of Burress's employers restricted him from performing any hazardous or "safety sensitive" duties or using any tools, equipment or powered industrial vehicles. (*Id*.)

**January 2018 PPE**

In January 2018, Burress applied for and received a conditional job offer at TMS, an onsite contractor at SSAB, for a position of dump truck driver. (Doc. 56-1 at 81-83; PageID. 314-16). After being extended a conditional offer with TMS, Burress underwent a pre-employment physical examination at Occupational Health Center ("OHC") with Laura Danielson, a Certified Registered Nurse Practitioner. (Doc. 56-1 at 83-86; PageID.316-19; Doc. 63-6; Doc. 63-38 at 14-17; PageID.1473-76.)

During the exam for TMS, Burress disclosed he took Adderall, Citalopram, and "xanex-periodically" [sic]. (Doc. 56-1 at 83-85; PageID.316-17; Doc. 63-6). Burress' accompanying drug screen indicated Xanax was not in his system. (Doc. 63-38 at 12; PageID.1471). OHC sent Dr. Edwards (Plaintiff's treating physician) a form to complete on which Dr. Edwards confirmed that Burress was being treated for Anxiety, that his prognosis and/or time to recovery was indefinite, that he was to continue taking the medications as they had been prescribed, and that Burress was cleared to work with no restrictions. (Doc. 63-6 at 7; PageID.913; Doc. 63-38 at 26-28; PageID.1485-87). The form sent to Dr. Edwards by OHC did not ask for Burress' medical records and did not ask for any details relating to the prescription for Xanax.  (Doc. 63-6 at 7; PageID.913).  Danielson has no recollection of asking Burress about his dosage, frequency, or whether he experienced actual side effects. (Doc. 63-38 at 22; PageID.1481). Danielson determined that Burress should not be cleared for "safety sensitive duties" or "operating heavy industrial equipment" at TMS.  (Doc. 63-6 at 8; PageID.914).  Xanax was the basis for this restriction. (Doc. 63-38 at 36-38; PageID.1495-97.)  Although she knew Xanax had a possible side effect of drowsiness, she did not know if it actually made Buress drowsy or if he took it at work. (Doc. 63-38 at 24-25; PageID.1483-84.)

**The Melt Shop**

In 2018, OTK recruited Burress to seek employment at its steel mill.  (Doc. 63-33 at 23-24; PageID.1251-52).  After an interview, OTK made Burress a conditional offer of employment as an Entry Operator in the LTS/CCM/SGP

department, the Melt Shop, with a start date of September 4, 2018. (Doc. 63-13.)
The offer was conditioned on Burress successfully completing a criminal background
check and pre-employment physical exam ("PPE"). (*Id*.)

Within the Melt Shop, there are a number of processes related to turning
steel into liquid metal. (Doc. 56-10 at 4-5; PageID.684-85; Doc. 56-4 at 3-4;
PageID.557-558). Multiple processes take place at the caster; first, a ladle is used to
pour liquid metal that has been heated to around 3,000 degrees into an
intermediate container, then that liquid metal is poured into a mold where it is
cooled and converted to slab form, then at the exit of the caster a large torch cuts
the solid metal into individual slabs. (Doc. 56-4 at 3-4; PageID.557-558). An Entry
Operator in the Melt Shop is responsible for tasks such as monitoring the chemistry
of the heat, making adjustments to the heat, maintenance, moving stock, and
operating the caster. (Doc. 56-10 at 5-6; PageID. 685-86). An Entry Operator in the
Melt Shop must work with heavy machinery (to include the caster and ladle),
operate and work around powered industrial trucks (to include forklifts, bobcats,
cranes, and hoists), and be able to work around hot molten steel. (Doc. 56-10 at 5-6;
PageID.685-86; Doc. 56-4 at 3; PageID.558).  Within the Melt Shop, Entry
Operators are regularly exposed to the following hazards: falls, pinch points,
moving equipment, burns, heat, noise, and working with and around heavy
equipment. (Doc. 56-4 at 4; PageID.558; Doc. 56-5 at 5-6; PageID.575-76; Doc.56-10
at 14; PageID.694)

5

**September PPE**

Since the Melt Shop opened in 2012, OTK has contracted with a third-party medical clinic, Occupational Health Clinic ("OHC") as its sole provider of PPEs. (Doc. 63-34 at 14; Page ID.1305). Dr. Terry Taylor and at least one other OHC employee have been onsite at OTK and have observed the working conditions there. (Doc. 56-5 at 5; PageID.575, Doc. 56-15 at 9, PageID.805; Doc. 56-16 at 19; PageID.827, Doc. 56-7 at 11; PageID.621).  OHC is provided with job descriptions for the positions at OTK for which it is performing pre-employment physical examinations. (Doc. 56-7 at 10-11; PageID.620-21; Doc. 56-16 at 17; PageID.825). Individuals undergoing pre-employment physical examinations are asked questions about their health and medications that they are taking. (Doc. 56-8 at 3-4; PageID. 637-38; Doc. 56-16 at 6-8; PageID. 802-04).  The physician or CRNP reviews the information provided, and, if there are concerns based on information provided or via the physical examination, additional information is sought from the individual's personal health care provider. (Doc.56-8 at 3-4; PageID.637-38; Doc. 56-15 at 8; PageID.804).  As part of the PPE, OHC's physician or certified nurse practitioner completes a pre-placement examination report ("PPE Report"), which designates whether the individual is cleared to perform the position with or without accommodations; this PPE report is transmitted to OTK. (Doc. 56-8 at 5-6; PageID.639-40; Doc. 56-15 at 3; PageID.799.

Burress underwent his PPE at OHC on August 28, 2018, and September 4, 2018. (Doc 63-7). Again, Laura Danielson conducted Burress's PPE. (Doc. 63-38 at

6

43; PageID.88).  She does not recall Burress or any discussion with him. (*Id*.)
When she walked in the room for Burress's PPE, she said, "I remember you from
the last time, do you still take xanex [sic]?" (Doc. 63-30 at 1; PageID.1115; Doc. 63-
32 at 86-87; PageID.1214-15). During his PPE for OTK, Burress again disclosed on
a medical history form that he was prescribed Citalopram, Adderall, and Xanax
0.5mg. (Doc. 63-7 at 5; PageID.919).  Burress's drug test again indicated he had no
Xanax in his system. (*Id*. at 6; PageID.920). Danielson documented he took Xanax
"PRN," meaning as needed, but did not inquire more specifically as to how often he
took the drug. (*Doc*. 63-38 at 79; PageID.1538).  Danielson noted that she would
"request records from his treating provider Dr. Edwards prior to clearing.
Discussed with Dr. Taylor. No IWR until records reviewed."  (Doc.63-7 at 12;
PageID.926). Danielson did not know whether Burress took Xanax during work
hours or whether he experienced any of the potential side effects.  (*Id*. at 58-59, 80-
81, 84: PageID.1517, 1539-40, 1543).

On September 4 and 6, 2018, Burress telephoned Dr. Edwards requesting he
send a list of his medications to OHC as part of the hiring process for a new job.
(Doc 63-11 at 4; PageID.864). Dr. Edwards sent a letter dated September 6, 2018,
that stated Burress was prescribed Xanax 0.5 mg to "take as needed for Panic
Disorder" and stated, "Should you have any questions regarding this prescription,
please feel free to contact me at the number listed above." (Doc. 63-7 at 29;
PageID.943.)  At her deposition, Danielson did not have a present recollection of
receiving or reviewing the letter, acknowledged there was no record of her doing so,

7

and does not know if anyone at OHC called Dr. Edwards to ask follow-up questions. (Doc. 63-38 at 76, 80-81; PageID.1535, 39-40).  Danielson ultimately determined that Burress was not cleared for safety-sensitive work and documented on the PPE Report that Burress "can perform the essential job functions with accommodation [of] no safety sensitive duties." (Doc. 63-7 at 27; PageID.941). She did not check the box for "Cannot perform essential job functions" or "Would present a direct threat to him or herself or others." (*Id*.)  Danielson's knowledge of the safety risks posed by Xanax was based on the side effects she recalled from the Pfizer drug insert.  (Doc. 63-38 at 83-84; PageID.1542-43.)  Danielson recalled the drug insert stating that Xanax could make you impaired cognitively and that one taking Xanax should not operate heavy machinery.  (*Id*.)  Danielson acknowledged that the Pfizer drug insert warning actually states, "until you experience how this medication affects you, do not drive a car or operate heavy machinery," which indicates that one should see how it affects a patient.  (*Id*. at 85-86; PageID.1544-45).  Had Burress not been taking Xanax, Danielson would not likely have put any kind of restriction on him. (*Id*. at 88; PageID.1547).

OHC reported the outcome of the PPE to OTK in a PPE Report and provided other pages from the exam. (Doc. 63-33 at 9, 11-14; PageID.1237, 39-42).  The OHC documentation stated that Burress took Xanax "PRN." (Doc. 63-34 at 46-47; PageID.1337-38).   Marva Rodriguez, OTK's HR Team Member Relations Representative, did not recall speaking to either Danielson or Dr. Taylor about Burress after receiving the PPE Report.  (Doc. 63-38 at 41-42; PageID.1269-70).

OTK did not seek additional information from Dr. Edwards.  (Doc. 56-5 at 7-8;
PageID.577).

After his PPE, Burress contacted OHC and Rodrigues multiple times to try to
provide information from his pharmacy and Dr. Edwards. (Docs. 63-18, 63-19, 63-
20, and Doc. 63-28 at 3-4; PageID.1107-08). Rodrigues assumed that these texts
were due to Burress trying to talk to OHC and have his doctor come to an
agreement with OHC about documentation to show that he could work in a safety-
sensitive environment. (Doc. 63-33 at 31-32; PageID.1259-60). However, because the
Entry Operator job required the ability to perform safety-sensitive job tasks,
Rodrigues decided to rescind Burress's offer based on OHC's PPE Report. (Doc. 63-
33 at 45-46; PageID.1273-74; Doc. 63-34 at 25-26; PageID.1316-17). Rodrigues
called Burress on September 7, 2018, to tell him his job offer was rescinded due to a
problem with his PPE. (Doc. 63-21; Doc. 63-33 at 36-37; PageID.1264-65).  Burress
asked if the decision had anything to do with his medication and said this happened
before at OHC and he was going to reach out to his doctor and OHC to get it cleared
up. (Doc. 63-32 at 92-93; PageID.1220-21; Doc. 63-33 at 17-18, 49; PageID.1245-46,
1277; Doc. 63-34 at 47-48; PageID.1338-39.) Burress then unsuccessfully attempted
to contact OTK and OHC multiple times to discuss the decision to rescind his offer.
(Doc. 63-28 at 3-5; PageID. 1107-09; Doc. 63-32 at 90-91; PageID.1218-19; Doc. 63-
30 at 2; PageID.1116; Doc. 63-33 at 36-39, 53; PageID.1264-67, 1281). Rodrigues
knew that Burress was trying to contact her to see what he could do to convince
OHC to change its position and OTK to reconsider rescinding his job. (Doc. 63-33 at

53; PageID.1281). No one at OTK ever responded to Burress. (Doc. 63-32 at 93; PageID.1221; Doc. 63-33 at 36-39, 53; PageID.1264-67, 1281).

OTK did not give Burress a copy of OTK's ADA policy, or instruct him how an applicant should request accommodation, or appeal a medical restriction. (Doc. 63-28 at 5; PageID.1109). Rodrigues did not know whether OTK ever gave OHC a copy of OTK's ADA policy, whether OTK provided information to applicants, Burress, or OHC about how to request an accommodation. (Doc. 63-34 at 26-27, 34-35, 37-38; PageID.1317-18; 1325-26, 1328-29). If a person has a restriction, Rodrigues has a responsibility to engage with a team member to see if there is any accommodation that can be met that OHC would then approve. (Doc. 63-33 at 61-62; PageID.1289-90).

After the rescission of his job offer, Burress discontinued taking Xanax altogether on September 11, 2018, with Dr. Edwards' consent. (Doc. 63-1 at 4-5; PageID.864-65; Doc. 63-32 at 59-62; PageID.1187-90). Rodrigues did not recall ever reconsidering her decision to rescind Burress' job offer, and did not know whether OHC ever reconsidered its assessment of Burress' ability to do safety sensitive duties. (Doc. 63-33 at 41, 46; PageID.1270, 1274). No one at OTK told Burress that his job offer was being rescinded because of his anxiety disorder or ADHD, and no one said anything leading him to that conclusion. (Doc. 56-1 at 109; PageID.342). No one at OTK told Burress or suggested to him that they believed him to be unable to perform a class or broad range of jobs. (*Id*.)

10

**Medical History/ Dr. Edwards**

In 2014, prior to the time of his conditional offer from OTK, Burress began

seeing psychiatrist Dr. James Edwards, after the deaths of his mother and brother.

(Doc. 63-1 at 2-3; PageID.861-62). Dr. Edwards treated Burress for ADHD and

anxiety until 2019. (Doc. 63-1). Dr. Edwards prescribed a dose of 0.5 mg alprazolam

(brand name Xanax) to be taken up to twice a day, primarily to help Burress sleep

and to treat any panic attacks if they occurred. (*Id*. at 1-3; PageID.861-63). Dr.

Edwards saw Burress every three months, on average, and confirmed during each

visit that he was taking Xanax responsibly and appropriately. (*Id*. at 2;

PageID.862). Dr. Edwards observed that Burress tolerated Xanax well and did not

experience difficulties with side effects causing him problems with normal

functioning at work. (*Id*). Burress twice reported to Dr. Edwards that Xanax made

him drowsy, and because of that Burress reported that he only took Xanax to sleep.

(*Id*. at 3; PageID.863). Burress has no recollection of the side effect of drowsiness

ever improving or feeling less lethargic over the course of taking Xanax. (Doc. 56-1

at 48-51; PageID.281-84 20). Burress always took Xanax more than five hours

before his next shift to prevent the risk of feeling drowsy at work. (Doc. 63-28 at 1;

PageID.1105). He never fell asleep at work after taking Xanax in advance of a shift,

nor did he ever feel drowsy, lethargic or inattentive at work on account of Xanax.

(Doc. 63-28 at 1; PageID.1105).

Xanax is a short-acting benzodiazepine. (Doc. 63-11 at 2; PageID. 974).

Drowsiness and lethargy are not common side effects of Xanax, though they do

11

occur. (Doc. 63-140 at 52; PageID.1625).  The effects of Xanax lasts four to five hours. (*Id*. at 98; PageID.1671).

In 2015, while working in a previous position at SSAB, Burress experienced a panic/anxiety attack while working with pulleys and hydraulics along with a co-worker; he did not report the attack to SSAB because he did not believe that he put himself or his co-worker in danger.  (Doc. 56-1 at 30-31; PageID.263-64).  Following his discontinuation of Xanax in October 2018, Burress complained of continued fatigue.  (Doc. 56-1 at 40-42; PageID.273-75).

**Dr. Swotinsky**

The EEOC has engaged Dr. Robert Swotinsky as an occupational medicine expert to opine whether it was reasonable and appropriate to disqualify Burress from safety sensitive duties based on his Xanax prescription. (Doc. 63-10; Doc. 63-11). According to Dr. Swotinsky, manufacturer drug warnings such as "be careful when driving a motor vehicle or operating machinery" are broadly used and "do not necessarily define likely safety risks." (Doc. 63-11 at 5; PageID.977). Thus, occupational physicians should not rely solely on warnings in manufacturer drug inserts to assess someone's ability to perform a job because such an assessment requires individualized determinations about medication use. (Doc. 63-11 at 5; PageID.977; Doc. 63-40 at 62-66, 72-73; PageID.1635-39, 1645-46). "If decision making was this simple it would not require a healthcare provider's involvement." (Doc. 63-11 at 6; PageID.978) "The point is, Pfizer's package insert advises that the use of Xanax may or may not pose a significant risk" and the doctor must keep this

12

potential risk in mind, while also looking at patient-specific factors such "reported side effects (which can vary widely between people) and other factors." (Doc. 63-11 at 6; PageID.978).

According to Dr. Swotinsky, it is not "very reasonable or appropriate" to disqualify Burress based on an unsupported "assumption that having prescription for Xanax and/or ... a history of anxiety makes one disqualified." (Doc. 63-40 at 107; PageID.1680). Rather than disqualify Burress based on a general drug warning about possible risks, OHC had a responsibility to conduct a due diligence review of what the job entails, the dosage, actual individual side effects, when the medication was taken, how long he had been on it, review medical and pharmacy records and discuss the matter with Dr. Edwards. (Doc. 63-40 at 45, 65-67, 69, 72-73, 102-05; PageID.1618, 1638-40, 1642, 1645-46, 1675-78). Dr. Swotinsky would not have disqualified Burress "just based on the Xanax" without doing "due diligence in trying to assess whether this guy is or isn't fit for duty." (*Id.* at 93-94; PageID. 1666-67). Dr. Swotinsky's medical opinion is that Burress posed no direct threat. (*Id.* at 110-11; PageID.1683-84).

## DISCUSSION

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's

function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th

14

Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, *2 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal

quotation and citation omitted).

## II.     Motion for Summary Judgment

OTK argues that summary judgment is due because: (1) Plaintiff did not

satisfy the administrative prerequisites; (2) Buress was not a qualified individual

with a disability; (3) Buress was not subjected to any form of disability

discrimination; (4) Burress was not denied a reasonable accommodation; (5) Burress

posed a direct threat of harm to himself or others as an Entry Shop Operator; (6) all

actions taken by OTK were for legitimate, non-discriminatory reasons; and (7) any

damages are limited by the doctrine of after acquired evidence. (Doc. 55 at 1-2;

PageID.200-01).  The Court will address each argument in turn.

### A.     Administrative Prerequisites

According to OTK, Burress' EEOC Charge was not timely filed, warranting

summary dismissal of his claims.  (Doc. 55 at 16-17; PageID.215-16).  More

specifically, OTK argues that Burress was notified that his conditional offer of

employment was rescinded by OTK on September 7, 2018, but he did not file a

Charge of Discrimination until March 12, 2019.  (*Id.*)  The EEOC contends that

Burress filed his initial Charge of Discrimination on February 4, 2019, within the

requisite time frame.  (Doc. 64 at 21-2; PageID.1737-38).

"[A]n ADA plaintiff must file a charge complaining about an allegedly

unlawful employment practice ... with the EEOC within 180 days of the [last

16

discriminatory] employment practice." *Maynard v. Pneumatic Prods. Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001) (citing 42 U.S.C. § 2000e–5(e)(1)); *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 421 F.3d 1169, 1178 (11th Cir. 2005). The records indicate that Burress' field a handwritten charge of discrimination on February 4, 2019. (Doc. 63-25 at 1; PageID.1099). There is no dispute that a charge filed on February 4, 2019 is timely. Further, OTK does not address the EEOC's position that Burress' charge was timely filed in its reply or otherwise challenge the arguments that the February 4, 2019, charge renders Burress's claims timely. Because Burress filed his charge on February 4, 2019, less than 180 days from the date of the alleged discriminatory conduct, Burress' claims are timely and summary judgment is not warranted on that ground.

## B. Discrimination in Violation of the Americans with Disabilities Act

Defendant asserts that there is no genuine issue of material fact regarding Plaintiff's claims brought under the Americans with Disabilities Act ("ADA"). (Doc. 55 at 18-23; PageID.217-22). In that regard, it argues that Plaintiff cannot show that Burress was a "qualified individual" or that he was discriminated against because of his disability, the second and third elements of his ADA claim. (*Id*.) More specifically, Defendant argues that "the ability to work in a safety-sensitive environment was an essential function of the Entry Operator position" and that Plaintiff could not perform that function "without posing a direct threat to himself and others or that reasonable accommodations were available." (Doc. 55 at 19; PageID.218). Alternatively, OTK argues that even if Burress was not a direct

17

threat, he was unable to perform the essential functions of the Entry Operator position.  (Doc.55 at 21-23; PageID.220-22).   OTK additionally contends that if Burress is a qualified individual, his employment offer was not rescinded "due to his disability".  (*Id.* at 23-24; PageID.222-23).  Finally, OTK contends that even if Plaintiff established a prima facia case, summary judgment is warranted because Plaintiff cannot show pretext.  (*Id.* at 27-29; PageID. 226-28).  Plaintiff argues that Burress is a qualified individual, was discriminated against due to his disability, and evidence of pretext exists.  (Doc. 64, generally)

### 1.  Direct or Circumstantial Evidence

To establish a *prima facie* case of discrimination under the ADA, Plaintiff must prove that:

> (1) [Plaintiff] is disabled; (2) he was a "qualified individual" at the relevant time, meaning he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) he was discriminated against because of his disability.

*Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) (citation omitted). An ADA plaintiff may prove a claim for discriminatory discharge by presenting direct evidence of discrimination or through the use of circumstantial evidence. *Wilson v. Gayfers Montgomery Fair Co.*, 953 F. Supp. 1415, 1421 (M.D. Ala. 1996) (citations omitted); *See Haynes v. W.C. Caye Co.*, 52 F.3d 928, 931 (11th Cir. 1995).

The parties dispute whether there is direct or circumstantial evidence of discrimination.  (*See* Doc. 55 at 18, PageID.217; Doc. 64 at 22-23, 27-28

18

PageID.1738-39, 1743-44; Doc. 66 at 2-4; PageID.1820-22).  Specifically, Plaintiff contends that there is direct evidence of discrimination because OTK rescinded its offer of employment to Burress based on his use of a prescription medication to treat his disability. (Doc. 64 at 22-23, 27-28 PageID.1738-39, 1743-44).[2]  OTK contends it rescinded Burress' job offer based on its reliance of a third-party medical examiner who imposed restrictions of "no safety sensitive duties" rendering Burress unable to perform the essential functions of the position he sought.  (Doc. 55 at 23-24; PageID.222-23).  Notably, Plaintiff does not dispute that no one at OTK told Burress that his job offer was being rescinded because of his anxiety disorder or ADHD, and no one said anything to Burress leading him to that conclusion. (Doc. 56-1 at 109; PageID.342).

Direct evidence is "that evidence which, if believed, 'establishes discriminatory intent without inference or presumption.' " *Gayfers*, 953 F. Supp. at 1415 n.10 (citing *Clark v. Coats & Clark*, 990 F.2d 1217, 1226 (11th Cir. 1993)). The plaintiff in a direct evidence case "must produce direct testimony that the employer acted with discriminatory motive, and must convince the trier of fact to accept the testimony." *E.E.O.C. v. Alton Packaging Corp*. 901 F.2d 920, 923 (11th Cir. 1990). "Evidence that only suggests discrimination, or that is subject to more than one interpretation does not constitute direct evidence." *Merritt v. Dillard Paper Co.*, 120

---

[2] Relying on *Teamsters v. United States*, 431 U.S. 324, 358 n. 44 (1977); *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 762 (5th Cir. 1996); *Breaux v. Bollinger Shipyards, LLC*, 2018 WL 3329059, at *10 (E.D. La. July 5, 2018). (*Id*. at fn 32).

F.3d 1181, 1190 (11th Cir. 1997) (citations omitted).

With regard to circumstantial evidence in ADA claims, the Eleventh Circuit applies the burden-shifting framework, established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Holy v. Clairson Indus., LLC.*, 492 F.3d 1247, 1255 (11th Cir. 2007). Once the plaintiff has proven a prima facie case, the burden shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its employment action. *See Burdine*, 450 U.S. at 253. "To satisfy the intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). If the defendant accomplishes this, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's alleged reason or reasons were a pretext for unlawful discrimination. *See Burdine*, 450 U.S. at 253.

The Court is not satisfied direct evidence of discrimination exists in this case such that the *McDonnell-Douglas* framework should not be applied.  It is undisputed that no one told Burress that his job was being rescinded based on his disability.  As such, lacking is any direct evidence of discriminatory motive. Further, the EEOC's direct evidence argument requires an inference that the OHC's conclusion were based on a disability due to Burress' use of medications.  Such an inference is not direct evidence. Accordingly, the Court will apply the *McDonnell-*

*Douglas* framework.

### 2. Whether Burress is a Qualified Individual

A "qualified individual" for ADA purposes is someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "An ADA plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that, ... that he can perform the essential functions of his job with a reasonable accommodation." *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007) (citation omitted). "If the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA." *Id.* (citation omitted)

The parties dispute both what the essential functions of the Entry Operator job are and whether Burress can perform those functions. With respect to whether Burress can perform the essential functions, OTK advances two theories (1) Burress is not a qualified individual because he posed a direct threat and (2) regardless of whether Burress posed a direct threat, he was unable to perform the essential functions of the job. The Court will address each argument in turn.

### a. The essential functions of the Entry Operator position

Defendant argues that "the ability to work in a safety-sensitive environment is an essential function of the Entry Operator position" (Doc. 55 at 19; PageID.218).

21

To show that the Melt Shop is a safety sensitive environment, OTK points out that the Entry Operator position would require Burress to work in the Melt Shop where steel is turned into liquid metal heated to approximately 3,000 degrees. (Doc. 55 at 20; PageID.219). OTK additionally indicates that that entry operators are routinely exposed to hazards such as: falls, pinch points, moving equipment, burns, heat, noise, and working with and around heavy equipment. (*Id*.) To show that safety sensitive duties are essential functions of the entry operator position, OTK relies on the job description which identifies the ability to work with liquid metals as an essential job function and that the Operator "must do so in a 'safe and efficient manner'". (Doc. 66 at 5-6; PageID.1823-24). OTK also relies on the testimony of current and former employees who confirmed that the ability to work with molten metal safely is essential to an Entry Operator's job. (*Id*.)

The EEOC does not concede that an ability to work in a safety sensitive environment is an essential function of the Entry Operator position. (Doc. 64 at 24-25; PageID.1741-42). Rather, the EEOC argues that OTK conflates essential job duties with "qualification standards". (Doc. 64 at 25; PageID.1741) It argues that in so doing, OHC did not determine whether Burress could perform specific duties which were essential to the operator job, but rather made assumptions about

potential medicinal side effects that may impact Burress' ability to be mentally alert, i.e. potentially unable to perform safety sensitive duties.[3]  (*Id.*).

Whether a function is essential is determined on a case-by-case basis. *Holly*, 492 F.3d at 1257.  "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.* Courts also consider the testimony of the plaintiff's supervisor. *Id.* at 1257-58. (citations omitted).  "Also considered are factors such as the amount of time spent on the job performing the function and the consequences of not requiring the employee to perform the function." *Ivey v. First Quality Retail Serv.*, 490 F. App'x 281, 285 (11th Cir. 2012) (citation omitted).

While the essential function analysis is mostly straight forward, its application to the facts of this case are somewhat unique, as the alleged essential functions "the ability to work in a safety sensitive environment" and "the ability to work with liquid metals … in a 'safe and efficient manner'" are similar to a qualification standard that requires an employee to perform the essential functions safely. According to Plaintiff, "OTK cites no cases finding [the ability to work in a safety sensitive environment] is an essential function and provides no evidence under the applicable tests to prove an essential job function."  (Doc. 64 at 25;

---

[3] Relying on *Toole v. Metal Servs. LLC*, 17 F. Supp. 3d 1161, 1171 (S.D. Ala. 2014) (quoting 29 C.F.R. § 1630.2(q) and *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (*en banc*).

PageID.1741).  Of course, Plaintiff has, likewise, not cited any binding authority that an "ability to work in a safety sensitive environment" cannot be an essential function.  (*See* Doc. 64, generally).  Perhaps confusing matters further, is that OTK interchangeably identifies the essential functions in various ways i.e., "ability to work with liquid metals", "ability to safely manipulate molten metal", "ability to work safely with heavy equipment in order to manipulate molten metal", "use heavy machinery, work in high locations, and manipulate molten metal heated to 3000° Fahrenheit".  (*See* Doc. 66 at 5, 6, 10; PageID.1823, 1824, 1828 ).  Nevertheless, despite its position, Plaintiff does not present any facts disputing that Burress must handle molten steel or operate heavy machinery. Plaintiff has additionally not presented any facts disputing that these tasks are "safety sensitive" or that the Melt Shop is a not a "safety sensitive environment".  Put differently, Plaintiff has not presented any facts disputing that OTK required the safe performance of these essential job functions.  As such, the Court is not convinced in this instance that the Entry Operator position does not carry with it as essential functions the ability to work in the Melt Shop, a safety sensitive environment, and/or the safe handling of molten steel which is unquestionably a safety sensitive task.  *See Brewer v. Tiffin Motorhomes, Inc.*, 2010 WL 11564932, *9, (N.D. Ala. July 30, 2010) ("the parties do not dispute that Tiffin required safe performance of the essential functions of the job") citing to *Weimer v. Honda of America Mfg., Inc.*, 356 Fed. Appx. 812, 818 (6th Cir. 2009) (recognizing that the ability to perform one's job safely may be an

24

essential function).  The question, then, is whether Burress could perform those functions.

### b. Direct Threat Defense

Defendant's primary argument is that Burress could not perform the safety-sensitive tasks of the Entry Operator job "without posing a direct threat to himself and others or that reasonable accommodations were available." (Doc. 55 at 19; PageID.218). Plaintiff argues that the facts establish that Burress was a qualified individual because he could perform the essential functions of the Entry Operator position without posing a direct threat. (Doc. 64 at 24-32; PageID.1740-48). Plaintiff's position relating to whether Burress posed a direct threat is twofold; (1) it argues Burress was able to perform the essential functions of the Entry Operator position (Doc. 64 at 26-27; PageID.1742-43) and (2), it argues that OTK did not perform an individualized inquiry as to whether Burress posed a direct threat. (*Id*. at 28-33; PageID.1744-49)**.** The Court will address each argument in turn.

### 1. Evidence that Burress was not a direct threat

Under the ADA, an employer cannot:

> "discriminate against a qualified individual on the basis of disability" by "using qualification standards ... that screen out or tend to screen out an individual with a disability." 42 U.S.C. § 12112(b)(6). "By that same definition ... as well as by separate provision, § 12113(a), the [ADA] creates an affirmative defense for action under a qualification standard 'shown to be job-related for the position in question and ... consistent with business necessity.' " *Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 78 (2002) (quoting 42 U.S.C. § 12112(b)(6)). A qualification standard may include a requirement that an individual shall not pose

> a direct threat to the health and safety of himself or others in the
> workplace. *Id.*; 29 C.F.R. § 1630.15(b)(2).

*Pollard v. Drummond Co.*, 2015 WL 5306084, at \*6 (N.D. Ala. Sept. 10, 2015).[4]

With respect to an employee who poses a "direct threat," an employer may

discriminate against him if the threat "cannot be eliminated by reasonable

accommodations." *Nevitt v. U.S. Steel Corp.*, 18 F. Supp. 3d 1322, 1333 (N.D. Ala.

2014) (quoting 42 U.S.C. § 12111(3)) (citing *Pinckney v. Potter*, 186 F. App'x 919,

925 (11th Cir. 2006)).  "Direct Threat means a significant risk of substantial harm

to the health or safety of the individual or others that cannot be eliminated or

reduced by reasonable accommodation." *Lewis v. City of Union City, Georgia*, 934

F.3d 1169, \*1184 (11th Cir. 2019) quoting 29 C.F.R. § 1630.2(r). "Under the direct

threat defense, an otherwise qualified employee—someone capable of performing

the job's essential functions—becomes effectively unqualified by [her] inability to

safely perform the essential functions of the job."  *Spencer-Martin v. Exxon Mobile

Corp.*, 2018 WL 3015759, \*8, (M.D. La. June 15, 2018) (citation omitted).  In the

Eleventh Circuit, the employee retains at all times the burden of persuading the

jury either that he was not a direct threat or that reasonable accommodations were

available. *See Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir.

1996).

---

[4] In *Pollard*, the plaintiff suffered from back pain which required a prescription for methadone.  The
parties did not dispute that the plaintiff was disabled.  The Court found a question of fact existed as
to whether the plaintiff posed a direct threat and whether defendant reasonably relied on physician's
opinions, defeating summary judgement on discrimination claim. *Pollard*, at \*7.

For support that Burress was a direct threat OTK relies on the environment of the Melt Shop and OHC's assessment, which included an in person exam by Danielson, who was familiar with the requirements of the Entry Operator position, and a review of the September 6, 2018, letter from Dr. Edwards. (*Id*. at 20-21; PageID.219-20).

To show that Burress was not a direct threat, Plaintiff points to the following facts: (1) Burress' track record of safely working in similar hazardous jobs[5]; (2) Danielson's failure to check the box on the PPE indicating Burress was a direct threat; (3) the testimony of its expert, Dr. Swotinsky, that Burress was not a direct threat; (4) the fact the Burress' treating physician cleared Burress in January 2018 to drive a dump truck and his observation that Burress was stable taking Xanax; (5) the testimony of Dr. Edwards that Burress never reported any lingering side effects of Xanax at work; and (6) the fact that Xanax does not affect everyone the same and Pfizer warns against operating heavy machinery only until the actual side effects on a person are known. (Doc. 64 at 26; PageID.1742).[6]

---

[5] OTK disputes that Burress' prior jobs were similar, although at a minimum OTK recognizes that while employed at SSAB Burress had to work with molten steel on a limited basis from time to time. (Doc. 63-32 at 28- 30; PageID. 1156-58).

[6] For legal support, the EEOC relies on *Pinckney v. Potter*, 186 F. App'x 919, 926 (11th Cir. 2006); *Nevitt v. United States Steel Corp.*, 18 F. Supp. 3d 1322, 1334 (N.D. Ala. 2014) (summary judgment not appropriate when determining whether plaintiff posed a direct threat hinges on an assessment of his credibility and the weighing of the conflicting medical evidence); *Cooper v. Walker Cty. E-911*, 2018 WL 3585217, at *11 (N.D. Ala. July 26, 2018) (disabled employee who had actually performed in the desired position was qualified individual); and *Breaux v. Bollinger Shipyards, LLC*, 2018 WL 3329059, at *10-11 (E.D. La. July 5, 2018) (Welder in "safety-sensitive" position could perform the essential functions despite taking "safety sensitive" drug that employer argued may have impacted his mental acuity, Suboxone). (Doc. 64 at 26-27; PageID.1742-43).

In reply, OTK argues that Burress could not "use heavy equipment to manipulate molten steel safely" based on Burress' medical records which show that Burress suffered from fatigue while talking Xanax, that the fatigue did not resolve at any time, and that when Burress stopped taking Xanax, he continued to experience fatigue.  (Doc. 66 at 6-7; PageID. 1824-25).  OTK additionally disputes that the testimony of Dr. Swotinsky and Dr. Edwards conflict with OHC. Namely, OTK characterizes Dr. Swotinsky's testimony to be that he did not have enough information to determine whether he would have cleared Burress and that Plaintiff failed to present testimony from Dr. Edwards stating Burress could perform all of the essential job functions of an Entry Operator. (*Id*).

As an initial matter, the Court notes a scarcity of binding legal authority discussing a direct threat defense in the context of a pre-hire medical exam.  Indeed, in support of its position that Burress posed a direct threat, OTK did not cite to any legal authority with facts similar to those present in this action. [7]  Nevertheless, the Court finds that Burress has presented facts from which a jury could reasonably conclude that he was not a direct threat.  First, the undisputed evidence is that Burress only took Xanax to sleep and never less than five hours prior to working.  Consequently, any side effects he may have experienced do not unequivocally establish he posed a direct threat.  On that note, Burress has additionally testified

---

[7] *See* Doc. 55 at 19-20 citing to *Price v. WG Yates & Sons Constr. Co.*, 2017 WL 5380434, at *1 (N.D. Fla. Mar. 27, 2017); Moses v. American Nonwovens, 97 F.3d 446, 447 (11th Cir. 1996)); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832 (11th Cir. 1998).

that he never experienced side effects at work and there is no evidence to the
contrary. Instead, Burress' track record of safety at work supports his testimony.
Specifically, Burress has presented evidence that he has worked in hazardous
environments, including one similar to the Melt Shop, without any safety incidents.
The testimony of Dr. Edwards also supports Burress' testimony as to when he took
Xanax and Dr. Edwards' records do no contradict that Burress only took Xanax to
sleep and did not experience side effects of Xanax at work. Finally, Plaintiff has
identified an expert in occupational medicine, Dr. Swotinsky, who has opined in
pertinent part, as follows: "Based on the above facts, my review of the complete
preplacement exam records from OHC, and the Entry Operator job description, my
assessment is that Mr. Burress could perform the job activities without
accommodation." (Doc. 63-11 at 11; PageID.983). Similarly, Dr. Swotinsky testified
as follows:

> Q: Do you agree with her assessment that Mr. Burress would not have
> presented a direct threat if he attempted to perform the job at
> Outokumpu?
>
> [...]
>
> A: Well, based on the information, I agree that he -- *based on the, you
> know, information available to me, I agree he would not have presented
> a direct threat*. I don't know if that was her assessment, or if she just
> neglected to fill out -- maybe she didn't -- I don't know why it wasn't
> checked off. It could be that she didn't agree with it, it could be that
> she didn't understand it. I don't know. *But I don't think he was a direct
> threat, based on the information I have.*

29

(Doc. 63-40 at 110-11; PageID.1683-84).  The Court finds that these facts, especially the differing opinions between the relevant physicians[8], when considered with the lack of dispute that Xanax affects every person differently, create a question of material fact as to whether Burress posed a direct threat.

### 2. Individualized Assessment

As indicated above, OTK unequivocally relied on the OHC assessment in support of its position that Burress posed a direct threat and Plaintiff has challenged whether the assessment was properly individualized.

> To assert a "direct threat" defense, the employer must have based its decision:
>
> on a reasonable medical judgment that relies on the most current medical knowledge and/or the best objective evidence and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job reached after considering, among other things, the imminence of the risk and the severity of the harm portended.

*Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quotation marks and citation omitted); *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1184 (11th Cir. 2019). In other words, at the heart of the direct threat inquiry is an attempt "to prohibit employers from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics." *Horton v. Hillshire Horton v.*

---

[8] *See Pinckney v. Potter*, 186 F. App'x 919, 926 (11th Cir. 2006) (denying summary judgment where conflicting medical opinions exists as to whether employee can perform the job without representing a direct threat to himself.)

*Hillshire Brands Co.*, 2018 WL 1729038, at *10 (N.D. Ala. Apr. 10, 2018) quoting

*EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1097 (11th Cir. 1998).

Consequently, "a good-faith belief that a significant risk of harm exists is

insufficient if it is not grounded in medical or other objective, scientific evidence."

*Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1308 (11th Cir. 2001). Instead, the employer

must have "made a reasonably informed and considered decision before taking an

adverse employment action." *Id*. An employer may reasonably rely on medical

evidence to make its employment decisions, but this reliance must "be reasonably

based on particularized facts." *Pollard*, 2015 WL 5306084, at *7 quoting *Lowe v.*

*Ala. Power Co.*, 244 F.3d 1305, 1308 (11th Cir. 2001). "[A]n assessment based on the

known possible side effects of a medication, as opposed to an individualized inquiry

into a patient's present ability to perform his job functions, is insufficient." *Id*. citing

*Haynes v. City of Montgomery*, 2008 WL 4495711, at *4-5 (M.D. Ala. Oct. 6, 2008)).

"In determining whether an individual would pose a direct threat, the factors to be

considered include: (1) the duration of the risk; (2) the nature and severity of the

potential harm; (3) the likelihood that the potential harm will occur; and (4) the

imminence of the potential harm." *Howard v. Norfolk Southern Corp.*, 2020 WL

5569922, *14 (N.D. Ala. September 17, 2020) citing *Jordan v. City of Union City,*

*GA*, 94 F.Supp.3d 1328, 1342 n.7 (N.D. Ga March 30, 2015) (quoting 29 C.F.R. §

1630.2(r)).

    Notably, OTK's motion does not address the relevant legal inquiry relating to

the individual assessment required of an employer asserting a direct threat defense.

(*See* Doc. 55, generally).  Rather, as discussed above, its position that Burress is a direct threat is based on the environment of the Melt Shop and OHC's assessment. (Doc. 55 at 20-21; PageID.219-20).  Specifically, OTK contends that the assessment was adequate because Danielson, who was familiar with the requirements of the Entry Operator position, completed an in-person physical exam and a review of the September 6, 2018, letter from Dr. Edwards.  (*Id*.).  OTK elaborates on the specifics of the assessment in its reply asserting that during Burress' exam, Danielson was informed Burress' prescription for Xanax and based on her knowledge that the Entry Operator Job was safety sensitive, she sought information from Burress's treating physician—Dr. Edwards[9], who responded with a brief letter confirming Burress' Xanax prescription without noting when Burress took Xanax or whether he had any side effects.  Danielson then, based on the above, did not clear Plaintiff for safety-sensitive work in the Melt Shop at OTK. (Doc. 66 at 9-10; PageID.1827-28).

In response, the EEOC argues that OTK failed to adequately determine whether Burress posed a direct threat by failing to obtain basic information relating to Burress' use of Xanax.  (Doc. 64 at 28; PageID.1744).   Instead, the EEOC argues that Danielson determined Burress could not perform safety sensitive duties from the moment she walked in the exam room and commented "Oh I remember you; you take Xanax."  (*Id*. at 29; PageID.1745).  The EEOC then asserts that Danielson relied solely on her "misunderstanding of the Pfizer drug warnings and possible side

_____

[9] It is disputed whether Danielson sought information from Dr. Edwards.

effects" when she determined Burress should be restricted from safety sensitive duties.  (*Id*. at 30; PageID.1746).

The Court is not satisfied that the OHC's assessment of Burress was an individualized inquiry of the Burress' present ability to safely perform the essential functions of the job as a matter of law. Although Daniels completed an in-person exam of Burress, the EEOC has presented facts which show that (1) Danielson did not determine whether Burress was actually taking Xanax, (2) if he was taking Xanax, how often or when, or (3) if he was experiencing any potential side effects of Xanax, or ever had.[10]  The parties additionally dispute whether Danielson requested any further medical information from Dr. Edwards after conducting Burress' PPE or whether Danielson reviewed Dr. Edwards' September 6th letter prior to imposing the subject restriction on Burress.  It is, however, undisputed that Danielson did not review any medical records from Dr. Edwards and did not discuss or otherwise follow-up with Dr. Edwards after Dr. Edwards sent the September 6th letter to OHC.  As a result, the assessment conducted by OHC produced normal results in all respects except for the fact that Burress had a prescription for Xanax

---

[10] Again, the Court appreciates OTK's arguments that there is evidence of Burress experiencing side effects from Xanax in his medical records. However, there is no dispute that Danielson did not review those records or know of those effects when she determined Burress should be restricted. Coupled with the fact that Danielson did not determine if or when Burress took Xanax, the fact that he experienced lethargy *at all*, when it is undisputed that he only took Xanax to sleep, does not support the automatic conclusion that he was unable to perform the essential functions of the job. OTK's argument that Dr. Edwards failed to present evidence that Burress did not experience side effects is also not compelling given that there is a dispute over whether OHC requested records from Dr. Edwards, and it is OTK's responsibility to conduct an individualized assessment to support its direct threat defense.

33

to be used "p.r.n." (as needed) for his Anxiety.  OTK has presented no facts that

Danielson relied on any medical studies relating to the use of Xanax in the

workplace or similar medical literature, beyond the Pfizer drug insert.  Further, no

facts have been presented which show that OHC or OTK considered "(1) the

duration of the risk; (2) the nature and severity of the potential harm; (3) the

likelihood that the potential harm will occur; and (4) the imminence of the potential

harm." *See Howard at* *14. Finally, the EEOC has retained a medical expert who

has opined that additional steps should have been taken to examine Burress and

that Burress was not a direct threat.   (Doc. 63-40 at 93-94, 110-11; PageID.1166-67,

1683-84).

While courts "do not require that the decisional process used by the employer

be optimal or that it left no stone unturned" *Smith v. Chrysler Corp.*, 155 F.3d 799,

807 (6th Cir.1998), they must as the ADA requires, conduct an "individualized

inquiry into [the employee's] present ability to perform his job functions". *Pollard*,

2015 WL 5306084, at *7 (citing *Chevron, 536 U.S. at 86.*).  In this action, a question

of fact exists as to whether the assessment performed by OHC was properly

individualized.[11] Accordingly, summary judgement is not warranted on a direct

threat defense.

---

[11] *See also United States EEOC v. T&T*, 457 F.Supp.3d 565, *575 (E.D. La April 29, 2020)("the
question ... is not whether it was reasonable for [defendant] to conclude that an employee [...] could
pose a direct threat; the question is whether [defendant] reasonably concluded that [the employee]
posed a direct threat via an individualized assessment that relied on the best available objective
evidence ...")

### c.   Evidence that Burress could perform the essential functions

OTK alternatively argues that even if Burress was not a direct threat, Burress "still could not show he was a qualified individual based on the restrictions imposed by OHC, which prevented him from performing certain essential functions of an Entry Operator". (Doc. 55 at 21; PageID.220). For legal support, OTK relies heavily on *Goff v. Performance Contractors, Inc.,* 2020 WL 1794967 (S.D. Ala. April 8, 2020); *Daw v. G.A. West & Co.*, 2021 WL 6052800 (S.D. Ala. Apr. 20, 2021).

The EEOC argues that OTK cannot rely on OHC because OHC failed to conduct a particularized assessment of Burress.  (Doc. 64 at 32; PageID.1748).  For legal support the EEOC relies on *Pollard* at *7 ("An employer may not rely upon the recommendation of a physician who . . . conducts a cursory examination and bases his opinion at least in part on a general assumption that all patients with the same disability have the same limitations") and *Lowe*, at 1309 (denying summary judgment where doctor's restrictions not based on actual capabilities but rather assumptions that all double amputees have the same.  (*Id*.). The EEOC additionally contends that OTK's reliance was not made in "good faith" defeating summary judgment on the issue.  (*Id*. at 33; PageID.1749).

Although not separately addressed by the parties, aside from the direct threat defense, the ADA permits the use of pre-employment screening to withdraw an offer of employment where an individualized determination reveals that the impairment will preclude the putative employee from performing the essential functions of the position. *See, e.g., E.E.O.C. v. American Tool & Mold, Inc.*, 21 F.

35

Supp.3d 1268, 1283 (M.D. Fla. 2014).  However, discrimination under the ADA also includes, "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter." 42 U.S.C. § 12112(b)(2).  As such, an employer cannot avoid liability under the ADA for decisions it attributes to a physician with respect an employee. *American Tool & Mold*. at fn. 6; citing to *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 484 (5th Cir. 2006) ("ConAgra cannot escape its obligation to evaluate Rodriguez's actual abilities, notwithstanding his diabetes, by blindly relying on the assessment of Dr. Morris."). [12];

OTK's reliance on *Goff* and *Daw* is not compelling.  Although the facts in *Goff* and *Daw* are unquestionably similar to the facts of this action, this Court's determination relating to OHC's assessment distinguishes this action.  OTK is correct that, in both *Goff*[13] and *Daw*, this Court determined that the plaintiff failed to show he was a qualified individual under the ADA when the employer relied on the opinion of a third-party medical professional performing a pre-hire medical

---

[12] Relying on *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 31 (1st Cir. 2002) ("a medical opinion is often cogent evidence of nondiscriminatory intent—in some instances, it may even be enough to justify summary judgment—but the mere obtaining of such an opinion does not automatically absolve the employer from liability under the ADA." The employer has an obligation to ensure that its applicants are treated as individuals; "[t]hus, an employer cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions.")

[13] In *Goff*, the third-party medical examiner placed restrictions of "[N]o working at heights above six feet that required to be tied off, a lifting restriction of 20 pounds.... And no operating any type of machinery, forklifts, company vehicles and such." *Goff* at *4).

screening. *Goff* at *8-10; *Daw* at *5. However, in neither of those cases did the

Court discuss in detail whether a properly individualized assessment took place in

relation to whether the plaintiffs were qualified individuals. Nevertheless, in *Goff*

*and Daw*, this Court alternatively determined that plaintiff presented no evidence

of pretext because the third-party medical examiner properly conducted an

"individualized assessment" in reaching its determinations about the plaintiff's

restrictions. Specifically, this Court stated as follows:

> [P]laintiff points to no evidence that Performance's decision was driven
> by discriminatory animus towards Goff based on his drop foot and back
> issues. Nor could plaintiff persuasively make such an argument, given
> the uncontroverted evidence that Performance's decision was based
> exclusively on Goff's work restrictions that precluded him from
> performing essential functions of the job. Instead, plaintiff focuses on
> the validity of Prime's determination that those work restrictions were
> appropriate because of Goff's long history of taking opioid pain
> medication. It is true, of course, that prohibited discrimination under
> the ADA includes "participating in a contractual or other arrangement
> or relationship that has the effect of subjecting a covered entity's
> qualified applicant or employee with a disability to the discrimination
> prohibited by this subchapter." 42 U.S.C. § 12112(b)(2). *But there is no*
> *evidence supporting a reasonable inference that the third-party medical*
> *professionals retained by Performance were motivated by*
> *discriminatory animus, myths, fears or stereotypes in placing those*
> *work restrictions on Goff. To the contrary, the record plainly establishes*
> *that the medical contractors (i) reviewed Goff's medical status and*
> *medication intake, including types, doses, frequencies, and duration;*
> *(ii) confirmed the medication-related information from Goff by*
> *telephone; (iii) examined the job description supplied by Performance*
> *for the position in question; and (iv) consulted and relied on industry*
> *standard sources, including particularly the American College of*
> *Occupational and Environmental Medicine's guidelines and*
> *recommendations concerning opioids and safety-sensitive work. This is*
> precisely the sort of "individualized determination" on which employers
> are permitted to rely in withdrawing an offer of employment. *See, e.g.,*
> *E.E.O.C. v. American Tool & Mold, Inc.*, 21 F. Supp.3d 1268, 1283
> (M.D. Fla. 2014) ("the results of the pre-employment screening may

> only be used to withdraw an offer of employment where an individualized determination reveals that the impairment will preclude the putative employee from performing the essential functions of the position").

*Goff* at *11 (italics added); *Daw* at *7 (There is also "no evidence supporting a reasonable inference that the third-party medical professionals retained by [GAW] were motivated by discriminatory animus, myths, fears or stereotypes in placing those work restrictions on [Daw]."

Contrary to the above discussion in *Goff*, in this action there is evidence supporting a reasonable inference that the third-party medical professionals retained by OTK were motivated by discriminatory animus, myths, fears, or stereotypes in placing those work restrictions on Burress.  Accordingly, *Goff* and *Daw* do not unequivocally establish that summary judgment is warranted in this action.[14]  Moreover, even if OTK believed in good faith that Burress could not perform the essential functions of the Entry Operator position, its belief is insufficient if it is "not grounded in medical or other objective, scientific evidence." *Haynes*, at *4 quoting *Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1308 (11th Cir. 2001) (citing *Bragdon v. Abbot*, 524 U.S. 624, 649 (1998)).  Accordingly, a question of fact exists as to whether Burress is a qualified individual.

### d. Reasonable Accommodation

---

[14] To be clear, the Court's determination in this action is not in contradiction to this Court's analysis in *Goff*.  Rather, unlike in this action, the third-party medical provider indisputably reviewed the prospective employee's medication intake (including frequency), personally confirmed the medication-related information with the prospective employee and consulted and relied on industry standard sources.  These facts are not present in the instant case.

OTK further contends that the EEOC has failed to identify any reasonable accommodation that would have enabled Buress to perform the essential safety-sensitive functions of the Entry Operator position.  (Doc. 55 at 22; PageID.221).

The EEOC argues that Burress was able to perform the essential functions of the entry operator position without accommodation.[15]  This Court having previously determined that questions of material facts exist as to whether Burress was a qualified individual, i.e., whether Burress could perform the position *without* accommodation, forecloses summary judgment in favor of OTK on the grounds that Burress is not a qualified individual because he did not identify a reasonable accommodation.

### 3. Whether Burress suffered an adverse action "due to disability"

OTK argues that even if the EEOC could show that Burress is a qualified individual, Plaintiff cannot demonstrate that Burress was discriminated against due to his disability, the third element of his discrimination claim.  (Doc. 55 at 23; PageID.222).  Instead, OTK argues it had a legitimate non-discriminatory reason for rescinding Burress' job offer "because OHC, a third party medical professional, informed OTK that after conducting a pre-hire medical screening, it determined Burress could not perform the safety-sensitive functions of an Entry Operator.  (*Id.*)

---

[15] The EEOC additionally advances an argument relating to OTK's failure to engage in the interactive process.  However, that argument is more appropriately addressed herein below with respect to OTK's request for summary judgment on Count II of Plaintiff's complaint for failure to accommodate.

Again, for legal support OTK relies primarily on *Goff* and *Daw*, *supra*.  (*Id*. at 23-24; PageID.222-23).  OTK also argues that Plaintiff cannot present evidence that OTK treated Burress less favorably than any other applicant or that OTK's decision to rescind Burress' offer was motivated by discriminatory animus or anything other than OTK's reliance OHC's conclusions. (*Id*. at 23-24; PageID.222-23).

The EEOC contends that because OTK rescinded Burress' job offer based on his disability-related medication, OTK discriminated against Burress.  (Doc. 64 at 27; PageID.1743).  More specifically, the EEOC argues that because medications are prescribed for impairments, adverse action taken because of medication is necessarily acting based on impairments.[16] (*Id*.).  For legal support, the EEOC relies on *Pollard,* at *7 (N.D. Ala. Sept. 10, 2015)(finding issue of material fact whether employer discriminated against plaintiff by terminating him because of his use of medication for back pain); *Rigby v. Springs Indus.,* 2006 U.S. Dist. LEXIS 101963, at *19 (N.D. Ala. May 5, 2006) (finding issue of material fact whether employee's use of medication presented a direct threat); *Haynes v. City of Montgomery, Ala.,* 344 F. App'x 519, 520 (11th Cir. 2009) (holding that plaintiff presented sufficient

---

[16] The parties do not dispute that Burress is disabled, so lacking from the relevant pleadings is any specific discussion of whether Plaintiff is advancing a discrimination claim only under Burress' non-contested actual disability or additionally under "regarded as" theory.  Notably "built in to the "regarded as" definition of disabled is an analysis of whether the employer subjected the employee "to an action prohibited under this chapter because of an actual or perceived physical or mental impairment." 42 U.S.C. § 12102(3)(A). The evidence tending to prove the "regarded as" definition of disabled therefore often is duplicative of the evidence relevant to the third prima facie element. *See Lewis v. City of Union City*, Ga 934 F.3d 1169, *1184 (11th Cir. 2019) citing 29 C.F.R. § Pt. 1630, App. On this point, the Court notes the EEOC repeatedly relies on cases wherein a plaintiff was considered "regarded as" disabled due to their medication.  *See e.g. Rigby*, *Haynes*, and *Howard*, *supra*. Notably, in *Howard*, the Court applied the *McDonnell-Douglas* framework.

evidence that employer discriminated against him based on perceived performance limitations from use of prescription medications); *Howard v. Norfolk S. Corp.,* 2020 WL 5569922, at *16 (N.D. Ala. Sept. 17, 2020) (finding genuine issue of material fact whether placing plaintiff on medical hold because of his use of medication was for a legitimate, nondiscriminatory reason). (*Id.* at 27-28; PageID.1743-44).

For the reasons previously stated. *Goff* and *Daw* do not compel summary judgment.  Further, the parties do not dispute that Burress' offer of employment was rescinded based on OHC's determination.  The record evidence, likewise, indicates that OHC's assessment was based on Burress' use of Xanax, which was prescribed to treat his anxiety, a disability.[17]  Moreover, a question of fact exists as to whether OHC's medical assessment was properly individualized. OTK has cited no legal authority compelling summary judgment when a question of fact exists in relation to the individualized assessment and makes no argument that Plaintiff cannot establish the third element of its prima facia case in its reply.  (*See* Doc. 66, generally).  Because in this action the evidence indicates that OHC was aware of Burress' disability and because questions of fact exist as to whether OTK's decision to rescind Burress' job offer was based on particularized facts using the best available objective medical evidence as required by the governing regulations, there

---

[17] While Plaintiff did not specifically distinguish this action from *Goff* and *Daw* on this element, the facts in this action are dissimilar from those before this Court in those cases.  Namely, in neither of those cases was there evidence that the employer was actually aware that the potential employee suffered from a disability or that the employee was "perceived as" disabled.  Thus, the *only* evidence relating to the third element was the third-party medical exam, which was again based on a properly individualized assessment.

is evidence from which a jury could determine that Burress suffered an adverse action due to his disability. *See Haynes* at *3 ("the City's admission that its decisions were based on possible side effects of medications, coupled with the evidence that the City failed to make an individualized assessment of Mr. Haynes's present ability to perform his job and of whether Mr. Haynes was a direct threat, constitutes a sufficient evidentiary basis from which a reasonable jury could conclude that "his disability was a motivating factor prompting the City's decisions." Accordingly, a question of fact exists as to the third element of Plaintiff's prima facia case which defeats summary judgment.

## 4.   Pretext

OTK argues that even if Plaintiff could establish a prima facia case of disability discrimination, OTK remains entitled to summary judgment because it "took all actions, including rescinding Burress' conditional job offer, for legitimate, non-discriminatory reasons" and Plaintiff cannot establish pretext. (Doc. 55 at 27-28; PageID.226-27).  OTK likewise asserts that "Plaintiff has presented no evidence that Outokumpu lacked good faith in relying on OHC's restrictions or that Outokumpu had any reason to believe OHC acted with discriminatory animus." (*Id.* at 28; PageID. 227). Instead, OTK argues that Plaintiff's theory of pretext relies solely on its belief that the medical examiners reached the wrong conclusion. (*Id.*).  Again, for legal support, OTK relies on *Goff* and *Daw*. (*Id.* at 28-29; PageID.227-28).

42

In response, the EEOC argues that Courts do not apply the *McDonnell Douglas* pretext analysis in cases involving disqualification for possible side effects for use of disability-related medication in violation of the ADA when the disqualification is not based on an individualized assessment of the plaintiff's present ability to do the job, but instead on assumption or speculation about possible side effects.  (Doc. 64 at 37; PageID.1753).  Next, Plaintiff asserts that the lack of evidence relating to comparators is based on discovery limitations.  (*Id.*)  The EEOC additionally contends OTK's argument that "mistake, lack of intent to discriminate, or good faith is not a defense" and that OTK's reliance on *Goff* and *Daw* is misplaced.  (*Id.* at 37-39; PageID.1753-55).  Finally, the EEOC argues that "OHC's PPE results, which lack any objective medical basis, coupled with OTK's failure to conduct any kind of actual risk analysis, reveal OTK's stated reason to be a pretext. (*Id.* at 39; PageID.1755).  For support, the EEOC primarily relies on *Howard* at *16, supra and *Rodriguez*, 436 F.3d at 484[18], discussed hereinabove. (*Id.*)

In reply, OTK argues that OHC performed an adequate individualized assessment which was not based solely on the side effects of Xanax making this case

_____

[18] The EEOC additionally cites *Holiday v. City of Chattanooga*, 206 F.3d 637, 647 (6th Cir. 2000) (OTK's proffered reason was pretextual because "the absence of any objective medical and scientific support for Dr. Dowlen's opinion casts doubt on the City's purported reliance on the physician's report."); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 32 (1st Cir. 2002) (finding that employer's reliance on its physician was not a legitimate, nondiscriminatory reason warranting summary judgment when a jury could find that the physician's opinion was unsupported); *Equal Emp. Opportunity Comm'n v. M.G.H.Fam. Health Ctr.*, 230 F. Supp. 3d 796, 810 (W.D. Mich. 2017) (OTK could not claim no responsibility for a recommendation it adopted, otherwise "all employers could simply contract out disability determinations to a third-party medical provider and simply be immune once they 'mechanically rel[ied] on the medical opinions and advice of third parties,' even if the medical opinions were objectively unreasonable[.]" (quoting *Keith v. Cty. of Oakland*, 703 F.3d 918, 923–24 (6th Cir. 2013) and citing *Holiday*, 206 F.3d at 645)).)

distinguishable from the facts in *Lowe*, *Pollard*, and *Howard*.  (Doc. 66 at 10-15; PageID.1833). Specifically likening this action to *Smith v Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998)[19], a case relied on by the Eleventh Circuit in *Lowe*, OTK argues that OHC "likewise reasonably relied on the information in front of it "to determine that Burress's Xanax use could lead to safety issues" because "[i]t had the opinion of a [Danielson], who consulted with a physician, […] It had literature describing drowsiness as a side effect of Xanax use. It had actual knowledge of the environment in which Burress would be working. And it had no contrary information from Dr. Edwards."  (Doc. 66 at 11-12; PageID.1829-30).

OTK additionally argues that *Lowe* is not contrary to this action, because unlike the plaintiff in *Lowe*, Burress admitted that his "Xanax-induced lethargy never got better and who, when going off Xanax, experienced even more drowsiness. (Doc. 56-1 at 48- 51; PageID.281-84).  Then, accepting that pursuant to *Howard v. Norfolk S. Corp., No.*, 2020 WL 5569922, at *15 (N.D. Ala. Sept. 17,2020)[20] and *Pollard*, 2015 WL 5306084, at *6[21], it would have been "impermissible for OHC, and thus OTK, to rely solely on Xanax's side effects to determine Burress could not work as an Entry Operator", OTK argues that OHC did not do so, because OHC was

---

[19] In *Smith*, the Sixth Circuit found that an employer reasonably relied on the information in front of it to find an employee failed to disclose his narcolepsy in his driver license application. *Id.* at 808. That information included letters from the employee's treating physician, the medical opinion of an examining physician, and notes from another physician showing that the employee admitted to having narcolepsy. *Id.*

[20] Holding an employer needs to do more than determine that use of a particular medication violates guidelines to make individualized inquiry under direct threat analysis.

[21] Holding physician's general knowledge of medication's side effects and general belief that person taking medicine should be subject to restrictions not individualized inquiry.

aware of the specific hazards in the Melt Shop and because Plaintiff's treating physician "failed to provide any information that would give OHC a reason to believe Burress was not a direct threat". (*Id*. at 13; PageID.1831). Finally, OTK argues *Goff* is not distinguishable. (*Id*. at 14; PageID.1832).

When a plaintiff establishes a prima facie case of disability discrimination, the burden shifts to the defendant to come forward with legitimate nondiscriminatory reasons for the challenged personnel action. *See Johnson v. Miami-Dade County*, 948 F.3d 1318, 1325 (11th Cir. 2020) ("if the defendant offers a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to establish that the reason offered by the defendant was not the real basis for the decision, but a pretext for discrimination") (citation and internal quotation marks omitted). Of course, "[a] reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018) (citations omitted). "A plaintiff may show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Howard*, at *11 citing *Dulaney v. Miami-Dade Cty*., 481 F. App'x 486, 490 (11th Cir. 2012) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

For reasons discussed herein above, a question of fact exists as to whether OHC conducted an individualized assessment and whether the recission of Burress'

45

job offer was due to his disability. Likewise, then, there is a question of fact as to whether OTK's blind reliance on OHC's assessment is a non-discriminatory reason for its employment decision. *See Howard* at *16 (denying summary judgment where employer's only reason for decision was use of medications and issues of material fact exist as to whether Defendant placing Plaintiff on a medical hold and disqualifying him from all safety-sensitive jobs was for a legitimate, nondiscriminatory reason.) Further, even if this Court accepted OTK's proffered reason as a non-discriminatory reason and moved on to whether the EEOC has established pretext, the result would be the same. *See Lowe, supra* (reversing district court's grant of summary judgment based on plaintiff's failure to establish pretext when questions of fact exists as to whether plaintiff was a qualified individual and employer relied on medical opinion that was not based on "particularized facts using the best available objective evidence as required by the regulations."); *see also Lisby v. Tarkett*, 2020 WL 1536386, *7 (N.D. Ala. March 31, 2020) (denying summary judgment on pretext grounds, in part, after employer relied on doctor who recommended "a total prohibition on performing safety sensitive work without assessing [plaintiff's] individualized impairments." Rather, for the same reasons that OTK cannot rely on OHC's assessment to show that Burress was not qualified or to show a lack of evidence that he suffered an adverse action due to his disability, it cannot rely on OHC assessment to establish a lack of pretext. Accordingly, summary judgment is not warranted.

46

### C.     Failure to Accommodate Claim

OTK argues that Burress' failure to accommodate claim fails because Burress never identified a specific reasonable accommodation that he communicated to Outokumpu.  (Doc. 55 at 24-25; PageID.223-24).  OTK alternatively contends that the accommodation proposed by the EEOC is the "elimination of the 'safety-sensitive' portion of the Entry Operator Job" was unreasonable and would have created an undue hardship.  (*Id.* at 26-27; PageID.225-26).

The EEOC argues that OTK's refusal to communicate with Burress after it rescinded his offer foreclosed Burress's ability to discuss a reasonable accommodation.[22]  More specifically, the EEOC asserts that OTK "cannot escape its duty to accommodate by refusing to enter into the interactive process".  (Doc. 64 at 34; PageID.1750).  The EEOC argues Burress called and texted Rodrigues multiple times in an effort to get a copy of the decision to rescind his offer in writing and in an effort to explain why Xanax did not keep him from working in a hazardous environment and also that he no longer took it.  (*Id.*)  It additionally contends that OTK's notice of Burress' disability triggered its responsibility to initiate the interactive process. (*Id.* at 35; PageID.1751).[23]  As such, according to the EEOC, had

---

[22] The EEOC addresses "failure to accommodate" in relation to whether Burress is a qualified individual, and not separately as to Count II, its failure to accommodate claim.  As the Court has discussed herein above, because there is a question of fact as to whether Burress could perform the essential functions of the job *without* an accommodation, summary judgment is not warranted in favor of OTK on the second element of Burress' discrimination claim.

[23] For legal support, the EEOC relies on *Spears v. Creel*, 607 F. App'x 943, 948 (11th Cir. 2015) (quoting 29 C.F.R. § 1630.2(o)(2)(ii)) and *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1116 (9th Cir. 2000); *Crutcher v. Mobile Hous. Bd.*, 2005 WL 2675207, at *12 (S.D. Ala. Oct. 20, 2005). "[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a

OTK "not ignored Burress, they would have reached an understanding that permitted Burress to be cleared by OHC[…]" because "Burress could have done the Melt Shop job safely without accommodation, either because OHC would have learned that his actual use of Xanax did not interfere with his ability to do safety sensitive work, or because by the time they spoke he would no longer be taking Xanax." (Doc. 64 at 33-35; PageID.1749-51).

To state a prima facie claim for failure to accommodate, the plaintiff must show that: (i) he is disabled; (ii) he is a qualified individual; and (iii) he was discriminated against by defendant's failure to provide a reasonable accommodation." *Howard*, at *11 citing *Williamson v. Clarke Cty. Dep't of Human Resources*, 834 F. Supp. 2d 1310, 1319 (S.D. Ala. 2011) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)); *see Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018).

> Employers must provide "reasonable accommodations" for disabled employees, "unless doing so would impose an undue hardship on the employer." *Williamson*, 834 F. Supp. 2d at 1319 (quoting *Crutcher v. Mobile Hous. Bd.*, 2005 WL 2675207, at *11 (S.D. Ala. Oct. 20, 2005)). In this circuit, "an employer's 'duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.' " *Williamson*, 834 F. Supp. 2d at 1320 (quoting *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999)). "Indeed, 'before an employer's duty to provide reasonable accommodations—or even to participate in the "interactive process"—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice.' " *Id*. With

---

failure to reasonably accommodate an employee, the employer violates the ADA." *Lowe v. Delta Airlines, Inc.*, 2017 WL 2982336, at *9 (N.D. Ga. May 31, 2017), *aff'd sub nom. Lowe v. Delta Air Lines Inc.*, 730 F. App'x 724 (11th Cir. 2018)) (other citation omitted)

respect to making an "adequate request," "at a minimum, the employee must request some change or adjustment in the workplace and must link that request to his disability, rather than simply presenting the request in a vacuum." *Id.* (citing authorities); see *Lucas*, 257 F.3d at 1255-56 ("The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions.")

*Howard*, at \*15.

As to the prima facia case, the parties do not dispute that Burress is disabled and for the reasons set forth hereinabove, there is at least a question of fact as to whether Burress is a qualified individual. Nevertheless, OTK argues Burress' failure to accommodate still fails because he did not make a request for an accommodation.

Although this Circuit has not "determined precisely what form [a request for an accommodation] must take," *Holly*, 492 F.3d at 1261 n.14, other circuits have addressed what qualifies as an adequate request. The Tenth Circuit, for example, has explained that a plaintiff "need not use magic words," but "should provide enough information about his or her limitations and desires [ ] to suggest at least the possibility that reasonable accommodation may be found in a reassignment job within the company." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999). Similarly, the Third Circuit has held that a plaintiff making a failure to accommodate claim must have provided "enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 314 (3d Cir. 1999).

*Adigun v. Express Scripts, Inc.*, 742 Fed.Appx.474, 476 (11th Cir. 2018).

With respect to Burress' efforts to discuss the recission of his job with OTK and/or OHC the facts establish that Burress (1) tried to reach OTK/OHC to discuss the reason for the decision and what information could be provided that would

make OTK reconsider the decision (Doc. 63-28 at 4; PageID.1108); (2) texted Rodrigues that he was waiting on the OHC medical review officer to call him back and asked Rodrigues whether the job offer would still be open if the review officer changed his mind and what paperwork would be needed if that occurred (*Id.*); (3) texted Rodrigues that he had been injury and accident free for five years and Dr. Edwards was going to call OHC (*Id.*); (4) called Rodrigues to request the rescission of his offer in writing and sent a follow up text to her to see if she received his voicemail (*Id.*); and (5) left messages with OHC's front desk staff regarding his "issue" and requested a return call (*Id.* at 4-5; PageID.1108-09).  According to Burress no one at OHC or OTK ever responded to his efforts, which he made "to find out what information I or Dr. Edwards could provide to show that Xanax did not affect my ability to work in a hazardous environment" and "to clear up any misunderstanding about how and when I took Xanax and explain it did not keep me from being able to work safely".  (*Id.* at 5; PageID.1109).  Rodrigues testified that she believed Burress continued to try to contact her after the job was rescinded "to see what he could do in order for OHC to change their position".  (Doc.63-33 at 53; PageID.1281).  Rodriguez affirmatively answered when she was asked whether Burress' efforts were also "ultimately, to see if Outokumpu would reconsider rescinding the job".  (*Id.*)  Rodrigues additionally testified as follows:

> Q. When you received the pre-placement physical or Pre-Placement Exam Report from OHC about a candidate, are those recommendations listed on the report such as needs accommodation and lists what the accommodation is, are those recommendations that you are required to follow?

[…]

A. Required? I don't say "required," I would say there are strong guidelines with the responsibility to engage in the interactive process.

Q. So do I understand you to say that you have some discretion whether or not to follow the recommendations on the Pre-Placement Exam Report?

A. No. That's not what I, in my head, said, so let me rephrase that. So if OHC tells me that a person has a restriction, I have to engage and have the responsibility to engage with the team member to see if there is any accommodation that can be met. If there's an accommodation, I would have to clear that with OHC to make sure that then that person would be able to perform the tasks with that accommodation and OHC would have to then come back and say the person is able to work and note that the accommodation was acceptable. But I could not hire somebody that says that they have to have an accommodation and just disregard what our medical professional says, no, I could not do that.

(Doc. 63-33 at 61-62: PageID.1289-90).  In this action, there is no dispute that OHC/OTK was aware of Burress' disability, that OHC placed restrictions on him due – at least in part – based on his use of Xanax to treat his disability, and that Burress was repeatedly attempting to discuss with OHC and OTK what could be done to alleviate his imposed restrictions. The Court finds, based on the above facts, that a reasonable juror could find Burress provided "enough information that, under the circumstances, OTK knew of both his disability and his desire for an accommodation." *See Taylor* at 314.  OTK's failure, then, to participate in the interactive process[24] does not support summary dismissal of Plaintiff's failure to accommodate claim.

---

[24] The Court appreciates that "where a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant." *Gober v. Newton*

### D.     Back Pay and Front Pay

OTK argues that even if Plaintiff could establish a claim of discrimination,

Burress is barred from recovering from front pay and is entitled only to back pay

damages up until the date OTK "discovered that Burress experienced a panic attack

at work and that, as close in time to his Outokumpu application as October, 2018,

he was admittedly falling asleep in an uncontrollable manner" because the same

would have resulted in the rescission of his job offer or termination of employment.

(Doc. 55 at 29; PageID.228).  More specifically, OTK asserts that in December 2021,

OTK learned that in October 2018 (two months after it rescinded Burress' job offer),

Burress was having trouble falling asleep suddenly and uncontrollably.  It asserts

that this event or new information would have resulted in rescission of Burress's

offer or termination.  Accordingly, OTK argues that back pay must be limited to the

time period of September 7, 2018 until December 10, 2021. (*Id*.). For legal support,

OTK relies on *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360-61

(1995) and *McDaniel v. Mississippi Baptist Medical Center*, 869 F. Supp. 445, 452

---

*County Board of Health*, *10 (N.D. Ga. December 17, 2021) quoting *Earl v. Mervyns, Inc.*, 207 F.3d
1361, 1367 (11th Cir. 2000).  It also agrees that OTK was not required to eliminate the essential
functions of the job.  *See Medearis v. CVS Pharmacy, Inc.*, 646 Fed. Appx. 891, 896 (11th Cir. 2016).
However, in this case, the EEOC argues that Burress' could have been accommodated by being
permitted to work while only taking medication at night and that OTK's failure to communicate with
Burress prevented him from explaining that he no longer took the medication that was the basis of
the restrictions.  This Court is not suggesting that it should be up to an employer to determine what
medications, if any, an employee should take.  Only, that in refusing to communicate with Buress, it
failed to understand that Burress's physician had already adjusted Burress' treatment which may
allow Burress to perform the job without concern from OHC or OTK.

(S.D. Miss. 1994)(holding after-acquired evidence of plaintiff's substance abuse relapse barred plaintiff from receiving front pay or reinstatement). *Id.*

The EEOC contends that the "after-acquired evidence doctrine has no applicability here, where Burress did not "engage in any misconduct, certainly none that was so grave that immediate discharge would have followed its disclosure." Doc. 64 at 36; PageID.1752).  It additionally contends that Burress was forthright in disclosing his prescription for Xanax and that "one episode of drowsiness outside of work and an anxiety attack three years before his application to OTK is not damages-limiting misconduct; in fact, it is not misconduct at all." (*Id.*).

With respect to the "after-acquired evidence doctrine", the Eleventh Circuit has stated as follows:

> The doctrine of after-acquired evidence finds its genesis in the Supreme Court's decision in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). There, after the employee was terminated, the employer came to discover that, during the employee's tenure, she had removed and copied company records in violation of her job responsibilities. *Id.* at 354–55, 115 S.Ct. at 882–83. With those facts in mind, the Supreme Court sought to delineate "[t]he proper boundaries of remedial relief in the general class of cases where, after termination, it is discovered that the employee has engaged in wrongdoing." *Id.* at 361, 115 S.Ct. at 886.

> The Court held that if the employer "establish[es] that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge," an award of back pay should generally be limited to the period of time "from the date of the unlawful discharge to the date the new information was discovered." *Id.* at 362–63, 115 S.Ct. at 886–87. This rule, the Court explained, best took into account "the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." *Id.* at 361, 115 S.Ct. at 886.

*Holland v.* Gee, 677 F.3d 1047, 1064-65 (11th Cir. 2012).  In *Wallace v. Dunn Construction Co., Inc.*, 62 F.3d 374 (11th Cir.1995), the Eleventh Circuit held that the after-acquired evidence doctrine also applies to cases arising under Title VII. *Id.* "Under the doctrine of after-acquired evidence, the burden is on the employer to prove that "the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone." *Id.* at 1065 citing to *McKennon* at 362-63.

OTK has cited no cases where an employee's damages were limited in a situation similar to those of this action.  Further, OTK did not respond to the EEOC's arguments relating to limiting Burress' damages in its reply or otherwise make an effort to reinforce that damages should be limited in this action. As such, summary judgment is not warranted.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is DENIED.

**DONE** and **ORDERED** this 1st day of September, 2022.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE

54